# State of Vermont v. Lynda Olson

[571 A.2d 619]

No. 87-353

Present: **Allen, C.J., Peck and Dooley, JJ., and Springer, D.J. (Ret.),**
**Specially Assigned**

Opinion Filed December 1, 1989

*Robert M. Butterfield,* Caledonia County Deputy State's Attorney, St. Johnsbury, for Plaintiff-Appellee.

*Robert Appel,* Public Defender, St. Johnsbury, for Defendant-Appellant.

**Peck, J.** Defendant appeals a conviction after a jury trial of driving under the influence of intoxicating liquor (23 V.S.A. § 1201(a)(2)). We affirm.

On the evening of November 22, 1986, some time before 11:10 p.m. defendant was involved in a two-car collision on Route 5 in St. Johnsbury Center. Vermont State Trooper Robert Clark arrived on the scene after the accident and saw defendant and a male companion, later identified as defendant's boy friend, standing by a guardrail on the side of the road. Defendant identified herself and stated that she was the operator of one of the cars. Trooper Clark noticed an odor of alcohol about defendant and observed that her eyes were bloodshot and watery. She seemed unsteady on her feet and spoke in a slurred manner. The officer asked if she had had anything to drink, and she responded that she had had some gin after the accident. She had a cut on her forehead and seemed to experience pain when walking.

Trooper Clark administered an alco-sensor test, which yielded a BAC level above .10%. He assisted defendant to the police cruiser, where he sought information about the accident. He testified that he did not administer a *Miranda* warning at this time, though he believed that defendant was not free to leave the cruiser. At trial defendant's counsel cross-examined Trooper Clark about that initial conversation in the cruiser:

 Q. Is it possible that she made certain admissions to you at that time? But—I'm not asking you whether she did or didn't because you can't recall?

 A. Yes, she could have. I remember a few questions I asked her. I don't remember the whole conversation.

Q. And there's no record of that conversation, is there?

A. No, I explained before when I was asked that question. I asked her social security number and the numbers for the accident form. The only piece of paper I had in my hand was the accident report form.

Q. And you were asking her about the nature of her operation? Whether, in fact she was the operator?

A. No, I already knew that. I wanted information—middle name, how many years driving, so I could fill out my accident report form like I do at every accident scene.

Q. In any case, there was extended conversation between the two of you in which she did not realize she had a right to remain silent and a right to speak with an attorney, is that correct?

A. I don't believe it was extended, no, Sir.

Despite the trooper's concession that he had not given a *Miranda* warning, defendant testified at the suppression hearing that "[h]e read me my rights before he questioned me," and that she requested an opportunity to talk with an attorney.

After arriving on the scene at about 11:30 p.m., Trooper Clark took defendant to the Northeastern Vermont Regional Hospital, but did not begin formal DUI processing until 12:45 a.m. He gave a *Miranda* warning, and defendant requested an attorney, with whom she spoke for some 19 minutes. At 1:17 a.m. the trooper obtained an evidentiary breath sample from defendant.

Defendant filed two motions to suppress prior to trial. The first, which was reserved until trial, concerned the admissibility of the blood alcohol content (BAC) test result.

The second motion sought on numerous grounds to suppress evidence concerning all statements made to Trooper Clark on the evening of the accident, both in the police cruiser and at the hospital. At the hearing on this motion the trooper testified that while defendant was awaiting medical treatment, prior to processing, he mentioned to her that there were outstanding arrest warrants for her boy friend. According to the trooper defendant "got emotional again and said I should arrest her and not him

because she was the one who was drunk and hit the lady in the accident."*

The trial court denied the second suppression motion, ruling first that defendant was in custody at the time she was placed in the police cruiser and that the officer was obligated to give her a *Miranda* warning at that time. However, relying on the United States Supreme Court's decision in *Oregon v. Elstad*, 470 U.S. 298 (1985), the court also concluded that despite the *Miranda* violation in the cruiser, since "there was no coercive aspect to the situation," the trooper's omission did not taint the later statements given in the hospital following a proper *Miranda* warning, assuming the statements were otherwise voluntarily given.

The court also concluded that the statements given after the *Miranda* warning were voluntary in fact because defendant was "cognizant of her rights" in spite of her injuries. The court added that the statement defendant blurted out following the trooper's remarks about her boy friend need not be suppressed, even if made prior to the *Miranda* warning, since that statement was volunteered and was not the product of any interrogation.

Defendant's motion to suppress the BAC test result was denied during trial, and defendant was thereafter convicted. The present appeal followed.

## I.

## A.

Defendant first attacks the denial of the motion to suppress the statements. She argues that the instant case is distinguishable from *Elstad*, where "[t]he initial conversation took place at midday, in the living room area of respondent's own home, with his mother in the kitchen area, a few steps away." 470 U.S. at

---

* The record supports defendant's assertion that Trooper Clark's testimony at the suppression hearing about this conversation was inconsistent with his testimony at trial. During the suppression hearing he testified that the conversation occurred immediately after arriving at the hospital, before giving the *Miranda* warning, while at trial he testified that the conversation occurred after the *Miranda* warning and after defendant spoke with counsel.

315. In the present case, defendant contends that she was questioned "in the coercive confines of [the trooper's] marked police cruiser complete with police radio, weapons and other trappings of force and authority." As a result, defendant contends that the original detention was coercive in character and that there was no break in the officer's continued detention from the questioning in the cruiser to the subsequent statements following the *Miranda* warning and defendant's telephone conversation with her attorney.

Defendant is correct that the noncoercive setting in *Elstad* was central to the Court's holding that an earlier voluntary, but unwarned, admission from a defendant did not taint a later confession resulting from a properly warned interrogation. The Court stated:

> There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspects's will and the uncertain consequences of disclosure of a "guilty secret" freely given in response to an unwarned but noncoercive question, as in this case.

470 U.S. at 312. The focus in *Elstad* is on the question of whether the first confession was coerced, thereby triggering a Fifth Amendment violation that would taint any later, presumably uncoerced confession. 470 U.S. at 310.

In the present matter, the trial court did not abuse its discretion in finding that the conversation in the police cruiser when the trooper first arrived on the accident scene was noncoercive. While the locus was a police cruiser, there is no evidence to support defendant's contention that the normal trappings of a cruiser are necessarily coercive. See *State v. Boardman*, 148 Vt. 229, 231, 531 A.2d 599, 601 (1987). To quote *Elstad*, the record is bereft of testimony concerning "deliberate means calculated to break the suspect's will." 470 U.S. at 312. These facts differ from those in *State v. Badger*, 141 Vt. 430, 450 A.2d 336 (1982), where the *Miranda* warning was preceded by 10 minutes of questioning that was "close and intense." 141 Vt. at 434, 450 A.2d at 339. It included the seizure, mid-interrogation, of defendant's blood-stained sneakers, followed by increasingly

accusatory questioning and a description by the interrogators of the "wealth of evidence available to the police as a means of verifying, or contradicting, the defendant's story." 141 Vt. at 435, 450 A.2d at 339. Finally, the police told the defendant in *Badger* that he was a suspect in a homicide, but that because he was a juvenile he "need not be incarcerated." *Id.*

■ In the present case, defendant established nothing more than the likelihood that some of the trooper's questions about the accident might also have had a bearing on the DUI case. Neither these questions nor answers are at issue on appeal since nothing defendant said in the cruiser was allowed to be introduced at trial (except for answers by the trooper directed at determining the nature of the interrogation itself).

## B.

Defendant next argues that the trial court's findings on her motion to suppress were inadequate. This record shows that those findings were sufficient to support the court's conclusions. The 19-minute conversation with her attorney sufficed to justify her consent to submission of a breath sample. Other than that sample, defendant does not point to any confessions, admissions, or statements subsequent to the *Miranda* warning which the State relied on at trial. The court found that defendant's utterance in response to the trooper's remark about her boy friend was not the product of a custodial interrogation but was volunteered. That finding appears to be well grounded in the record and within the discretion of the trial court.

The most pronounced factual dispute between defendant and the trooper arose over when defendant first requested access to an attorney. Defendant testified that she did so immediately after entering the police cruiser, while Trooper Clark testified that she made the request only after receiving her *Miranda* warning in the hospital. The court also concluded that the confinement in the cruiser had not been coercive—a finding that was necessary to the court's reliance on *Elstad.* On the question of voluntariness the court stated:

> The issue, if there is one, concerning voluntariness, I think, goes to Miss Olson's medical condition and even though she

received a cut on the head and grimaced while walking, all of the other objective factors suggest that she was fully cognizant of her rights, understood them, and waived them voluntarily. I think to find an involuntary waiver, I would have to conclude that somehow because of her physical condition, her will was—her free will to waive the rights was overborne by her medical condition and there's simply no evidence whatsoever that she was not fully in control of her mental faculties.

■ Defendant argues that the State failed to prove that she knowingly and intelligently waived her rights after receiving a *Miranda* warning. Defendant contends that the trial court did not consider her "age, experience, education, background, and intelligence, and . . . whether [she] has the capacity to understand the warnings given [her], the nature of [her] Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.*, 442 U.S. 707, 725 (1979), *cited in State v. Malinowski*, 148 Vt. 517, 520, 536 A.2d 921, 923 (1987). The State has the clear burden of proof on this issue. *Malinowski*, 148 Vt. at 523, 536 A.2d at 925. We have "also indicated great deference to the trial court's findings under the totality of circumstances approach." *Id.* at 520, 536 A.2d at 923. *Malinowski* can be distinguished, from this case. In *Malinowski*, the waiver was arguably vague, and defendant's understanding of the waiver was questionable. 148 Vt. at 521–22, 536 A.2d at 924. None of those factors are present here.

■ Defendant is correct that the suppression hearing record is blank concerning defendant's age, experience, education, background, intelligence, and general capacity to understand the warnings given her. The single substantive question posed to defendant during the suppression hearing related to when she was given a *Miranda* warning. The central issue, however, was defendant's physical condition, and the trial court did make very specific findings on her physical and mental condition at the time she was given the warning. Therefore, we find no error in the court's determination that defendant's waiver was knowing, intelligent, and voluntary.

## II.

Defendant also argues that the blood alcohol test evidence derived from the breath sample should have been excluded, first, because the State's expert did not properly consider defendant's testimony that she drank some alcohol after the accident and second, because of the long period between the time of operation and the taking of the breath sample.

### A.

■ Defendant argues that the chemist testifying for the State should not have been permitted to testify to his belief that defendant's .10 percent BAC test result related back to the time of operation as a .13, because of defendant's testimony that she consumed alcohol following the accident. In support of this contention defendant excerpts only a portion of the expert's testimony, essentially that consumption of a very small amount of alcohol after the accident would only have slightly affected the final test result. That testimony, elicited by the prosecuting attorney after the expert testified that the BAC of .13 percent related back to the time of operation, proceeded as follows:

Q. Now, if we take that same hypothetical and factor into that, the fact that the person who's .10 at 1:17 in the morning had a sip of gin at the time of the accident—at the time of the operation at 11:10 PM, does that change your result?

A. Well, of course, that would depend upon the size of the sip but as I understand a sip, I would say, no, it would not change the results.

On cross-examination defendant's counsel posed additional hypotheticals to the expert, based on "gulps" instead of a "sip," and the witness responded as follows:

A. Based on that scenario, if three ounces of 80 proof gin were consumed shortly after the time of the stop, then I would have to subtract that from my calculation of alcohol level back to the time of operation and that would then make that BAC at the time of operation approximately .05%.

Since the evidence concerning the amount of alcohol consumed by defendant was uncertain, it was appropriate for respective counsel to pose hypothetical questions consistent with the evidence. *State v. Rollins*, 141 Vt. 105, 111, 444 A.2d 884, 887 (1982); see *Marsigli Estate v. Granite City Auto Sales, Inc.*, 124 Vt. 95, 102, 197 A.2d 799, 804 (1964). The State's position that defendant's statement to the trooper established the consumption of only a "sip" and that such a small quantity did not taint the BAC result was not inconsistent with the testimony and thus could serve as the basis for the expert opinion. The State's assertions about the amount of post-accident alcohol consumed by defendant were as well grounded in defendant's testimony as were the assertions of defendant's counsel on cross-examination. The trial court's careful instruction to the jury, to which there was no objection, allowed the jury to consider either scenario on an equal basis. The test result was related back sufficiently to allow it to be admitted. The weakness in the basis for the opinion shown on cross-examination went to weight, not admissibility.

## B.

■ Defendant argues that the passage of two hours and fifteen minutes between the time of operation and the taking of the breath sample rendered the evidence fatally imprecise, citing *State v. Dumont*, 146 Vt. 252, 499 A.2d 787 (1985), where "the time gap of one hour and ten minutes contributed to the reversal." It was not the passage of time that lay at the heart of our holding in *Dumont*, but rather the failure of the State to relate the BAC test result back to the time of operation. While the responses of the State's expert to defendant's counsel's hypothetical questions ranged as low as .05 percent BAC, the testimony concerning the expert's own opinion as to the BAC, related back to time of operation, was unswerving and well within the scope of the evidence presented.

## III.

■ Finally, defendant raises as plain error the contention that she was arrested by an officer who did not observe the events in question and therefore lacked authority to detain her

under V.R.Cr.P. 3(a). The issue was not raised below and was therefore not properly preserved for appeal. *State v. Byrne*, 149 Vt. 257, 542 A.2d 667 (1988). The grounds cited by defendant do not strike at "the very heart of the defendant's constitutional rights." *State v. Hoadley*, 147 Vt. 49, 53, 512 A.2d 879, 881 (1986). Defendant's claim under V.R.Cr.P. 3(a) did not rise to a constitutional dimension and did not constitute plain error.

*Affirmed.*

