## State of Vermont v. Edwin A. Towne

[615 A.2d 484]

No. 89-298

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed May 22, 1992

Motion for Reargument Denied July 6, 1992

610

*William H. Sorrell*, Chittenden County State's Attorney, and *Rosemary S. Hull*, Deputy State's Attorney, Burlington, and *Gary Kessler*, Supervising Appellate Prosecutor, and *Pamela Hall Johnson*, Appellate Prosecutor, Montpelier, for Plaintiff-Appellee.

*E.M. Allen*, Defender General, and *William A. Nelson*, Appellate Attorney, Montpelier, for Defendant-Appellant.

**Johnson, J.** Defendant appeals from a conviction of first degree murder. He claims that (1) a search warrant issued for his residence was not supported by probable cause; (2) his refusal to comply with a nontestimonial identification order should have been suppressed because it violated V.R.Cr.P. 41.1, Article 11 of the Vermont Constitution, and the Fourth Amendment to the United States Constitution; (3) a statement he made to the police should have been suppressed because it was obtained in violation of his rights under the Fifth and Sixth Amendments to the United States Constitution; (4) his arrest was illegal; and (5) the information was deficient and improperly amended. We affirm.

At about 8:10 a.m on September 10, 1986, Paulette Crickmore was last seen alive on the Jericho Road in Richmond, Vermont, on her way to Mt. Mansfield Union High School. By October,

police investigations of her disappearance had focused on defendant, who lived in the area and was on parole after a conviction of sexual assault. On October 21, 1986, the police, in possession of a New Hampshire fugitive warrant and aware that defendant possessed a firearm in violation of federal law, arrested defendant and questioned him about his whereabouts at the time Crickmore disappeared. Defendant admitted that he was on the Jericho Road the morning of September 10 on his way to Eden, where he was constructing the foundation to his future home. The police learned through conversations with defendant's employer that defendant had acquired a number of cement blocks for his foundation on September 12, 1986.

The victim's body was recovered in November 1986 in a wooded area off the River Road in Duxbury, Vermont. Upon examining the remains, the police medical examiner concluded that she had been murdered by three gunshots to the head; the bullets used were recovered from the corpse along with a number of unidentified hairs. The position of the victim's clothes suggested she had been raped prior to the murder.

By mid-November, a Department of Public Safety firearms expert had concluded that the bullets recovered from the victim's body were fired from a .32 caliber Smith & Wesson long revolver. In early December, the police learned from defendant's girlfriend and her son that defendant had purchased a .32 caliber revolver in Rochester, Vermont. An examination of the records from the gun shop where the weapon was purchased revealed that the date of purchase was July 27, 1986. Defendant's employer informed the police that defendant sometimes fired live ammunition into the wall at his place of business. On December 5, two bullets were recovered from that wall, and an examination of the bullets by a firearms expert revealed that one of the bullets recovered was fired from the same gun that fired the bullets recovered from the victim's body.

On December 6, 1986, the police obtained a warrant to search the foundation of defendant's house with a metal detector. A prior search of the house by federal agents had yielded several firearms but not the .32 revolver. A gun, later determined to be the murder weapon, was recovered from one of the cement blocks comprising the foundation.

Defendant was charged on December 7, 1986. On December 18, a nontestimonial identification order was issued requiring

defendant to appear at the St. Albans Correctional Center and submit samples of pubic and head hair. Defendant failed to comply even after the trial court ruled that his refusal would be sanctioned by allowing it to be introduced at trial as evidence of guilt. In September 1987, the police received an F.B.I. report indicating that no hair of value for comparison had been recovered from the victim's remains.

Defendant was tried and convicted in January 1989. This appeal followed.

## I. The Search Warrant

Defendant contends that the murder weapon should have been suppressed because the search of his house was conducted pursuant to a warrant not supported by probable cause.

The evidence sought in the warrant application was the murder weapon and any items that could be identified as belonging to Paulette Crickmore. The place to be searched was defendant's house, particularly its foundation. Defendant admits that facts in the affidavit supporting the search warrant provided probable cause to believe he committed the crime, but, citing *State v. Brown*, 151 Vt. 533, 535 n.2, 562 A.2d 1057, 1058–59 n.2 (1989), he argues it was not "more likely than not" that the murder weapon would be found in the foundation of his house.

Preliminarily, the State argues that *Brown*'s "more likely than not" standard for probable cause is erroneous and should be overruled. To the extent that *Brown* requires a rigid quantitative analysis for determining probable cause, we agree that it is not the correct standard and now overrule that portion of *Brown*. Defendant's chief argument—that in murder cases the most likely probability will always be that the murderer, once suspected, will dispose of the weapon—demonstrates the weakness of the *Brown* rule. Under *Brown*, whenever the evidence was most likely destroyed or disposed of, the police would not have probable cause to search for it anywhere.

The only support cited for *Brown*'s more-likely-than-not standard is two ambiguous statements in *Spinelli v. United States*, 393 U.S. 410, 418, 419 (1969), one suggesting that probable cause requires information sufficient to "ripen into a judgment that a crime was *probably* being committed" and the other

that "only *the probability*, and not a prima facie showing, of criminal activity is the standard of probable cause." *Brown*, 151 Vt. at 535 n.2, 562 A.2d at 1058–59 n.2 (emphasis added). The reasoning of the *Brown* footnote appears to be that probable cause, probably, and probability all mean the same thing—that something will, more likely than not, occur. The historical and etymological evidence, however, does not support this conclusion.

During the eighteenth century when the warrant clause was written, "probable" meant "provable." See 12 Oxford English Dictionary 535 (2d ed. 1989) ("probable" originally meant "Capable of being proved; demonstrable, provable. . . . Such as to approve or commend itself to the mind; worthy of acceptance or belief; rarely in bad sense, plausible, specious, colourable"); A Model Code of Pre-Arraignment Procedure 292 (1975) (in earlier times, "probable" meant "capable of being proved or worthy of belief"). The concept "was not linked to more recent notions of probabilities measured mathematically." Model Code, *supra*, at 292–93; McCauliff, *Burdens of Proof: Degrees of Belief, Quanta of Evidence, or Constitutional Guarantees?*, 35 Vand. L. Rev. 1293, 1327 n.192 (1982).

Conversely, as "probable" has, in modern times, come to take on mathematical connotations, "probable cause" has sometimes been replaced by "reasonable cause," thought to be a modern analogue more closely approximating the original meaning of probable cause, without any reference to probability. See Model Code, *supra*, at 499–501; see also *Carroll v. United States*, 267 U.S. 132, 155–56 (1925) (equating probable cause with reasonableness); *United States v. Melvin*, 596 F.2d 492, 495 (1st Cir. 1979) (equating "probable cause" with "reasonable grounds to believe" and rejecting more-likely-than-not standard).

Even assuming *Spinelli* does support a more-probable-than-not standard, that decision has limited precedential value. In *Illinois v. Gates*, 462 U.S. 213 (1983), the Court rejected not only *Spinelli's* approach to informant credibility, but also returned to its more traditional language on probable cause. The *Gates* Court reaffirmed that probable cause is a "fluid concept" that is "not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232. It "requires only a *probability* or *substantial chance* of criminal activity." *Id.* at 244 n.13 (emphasis

added). One commentator argues that with this language, the *Gates* Court "made it fairly clear . . . that 'probable cause' is *something less* than 'more-probable-than-not' (although how much less is anything but clear)." Kamisar, *Gates, "Probable Cause," "Good Faith," and Beyond*, 69 Iowa L. Rev. 551, 588 (1984); see also *Texas v. Brown*, 460 U.S. 730, 742 (1983) (a plurality of the Court held that probable cause does not demand a showing that a belief be "more likely true than false").

State courts asked to adopt a more-likely-than-not standard have also uniformly declined to do so, opting for a more flexible approach. See, e.g., *Edwards v. State*, 300 Ark. 4, 9, 775 S.W.2d 900, 903 (1989) (interpreting state rules of criminal procedure as rejecting more-probable-than-not standard); *People v. Hearty*, 644 P.2d 302, 310 (Colo. 1982) (en banc) (equating probable cause with "reasonable grounds" rather than mathematical probability); *State v. Laws*, 801 S.W.2d 68, 70 (Mo. 1990) (en banc) (not necessary to establish probable cause by a preponderance of the evidence, only by a "fair probability"); *State v. Sundberg*, 235 Mont. 115, 120, 765 P.2d 736, 739–40 (1988) (noting that the United States Supreme Court has never required more-likely-than-not standard and likewise refusing to adopt the standard); see also Model Code, *supra*, at 499–500 (rejecting more-probable-than-not standard for probable cause to search and stating that "there appear to be no cases in which it has been actually applied").

Although we do not follow *Gates* in all its particulars, see *State v. Ballou*, 148 Vt. 427, 432–33, 535 A.2d 1280, 1283 (1987) (V.R.Cr.P. 41(c) adopts *Aquilar/Spinelli* rather than *Gates* standard for evaluating search warrants based on hearsay), our overall approach to reviewing warrants is consistent with *Gates*. Our cases—both before and after *Brown*—emphasize that affidavits in support of a search warrant "'must be viewed in a common sense manner and not be subjected to hypertechnical scrutiny.'" *State v. Weiss*, 155 Vt. 558, 562, 587 A.2d 73, 75 (1990) (quoting *Ballou*, 148 Vt. at 434, 535 A.2d at 1284). Rather, the totality of the circumstances must be examined to determine whether "there was substantial evidence supporting the warrant." *Id.*

*Weiss* is one of two cases that cite, but ultimately do not apply, *Brown*'s more-likely-than-not standard. In the other case,

*State v. Platt*, 154 Vt. 179, 574 A.2d 789 (1990), the Court cited *Brown* parenthetically, *id.* at 186, 574 A.2d at 793, but relied on V.R.Cr.P. 41(c) (probable cause must be based on "substantial evidence") and *Ballou* ("key inquiry" in probable-cause determination is "whether the information provided in the affidavit reveals circumstances from which a person of reasonable caution would conclude that a crime has been committed and that evidence of the crime will be found in the place to be searched"). *Id.* at 185, 574 A.2d at 793.

The more-likely-than-not standard articulated in *Brown* emerged from a concern with the amorphous nature of probable cause. Protection against police abuse lies not in quantification but in the requirement that there be a nexus between the crime, the suspect, and the place to be searched.

■ In determining probable cause, the magistrate may consider the strength of the nexus between the defendant and the crime, and where that connection is strong, the link between the place to be searched and the evidence sought need not be as strong, if the place is one over which defendant exercises control. See 1 W. LaFave, Search and Seizure § 3.2(e), at 598–99 (2d ed. 1987). Although the police may have probable cause that a suspect committed a particular crime, they will not always have probable cause to search "all places over which that individual exercises control." *Id.* at 600. Rather, there must be particular facts or logical inferences supporting a conclusion that the place to be searched may contain evidence.

■ Probable cause "'can be inferred from the nature of the crime, the type of materials sought, the extent of an opportunity for concealment, and reasonable inferences as to criminal behavior.'" *Weiss*, 155 Vt. at 563, 587 A.2d at 76 (quoting *State v. Moran*, 141 Vt. 10, 17, 444 A.2d 879, 882 (1982)).

Here, defendant was connected to the crime. He had been involved in prior abductions of young women, and he admitted to being on the Jericho Road on the morning of the murder. In addition, he was closely connected with the murder weapon. He was known to have purchased a .32 caliber revolver a few months before the murder; a bullet from that gun matched one taken from the victim. Given that his connections with the crime and the weapon were so strong, it was reasonable to be-

lieve that, if the weapon still existed, it would be somewhere within defendant's control.

■ Ordinarily, the home is the first place to look for evidence of a crime. See *Moran*, 141 Vt. at 17, 444 A.2d at 882 (quoting *United States v. Green*, 634 F.2d 222, 226 (5th Cir. 1981) ("'[F]ew places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime.'"). A home provides the maximum of both privacy and accessibility. "Where the object of the search is a weapon used in the crime . . ., the inference that the [item is] at the offender's residence is especially compelling . . . ." 2 W. LaFave, *supra*, § 3.7(d), at 108; see also *State v. Couture*, 194 Conn. 530, 536–46, 482 A.2d 300, 304–10 (1984) (probable cause existed to search defendant's house for murder weapon where defendant was identified as perpetrator of armed robbery and murder, but was not aware he was suspected); *Mills v. State*, 278 Md. 262, 276–80, 363 A.2d 491, 499–501 (1976) (probable cause existed to search defendant's residence where defendant was identified as rapist, because his "home was a probable place for secreting objects" such as hunting knife used during the crime); *Commonwealth v. Cinelli*, 389 Mass. 197, 213, 449 N.E.2d 1207, 1216 (1983) (where probable cause existed to believe defendant committed armed robbery, probable cause existed to search defendant's house for weapons and ammunition, because articles were "the type of things that reasonably might be expected to be located in the residence of a person who had participated in an armed robbery"); *State v. Faragi*, 127 N.H. 1, 5–7, 498 A.2d 723, 727 (1985) (warrant to search defendant's residence was valid where defendant had been linked to homicide and murder weapon was not found on defendant or in vicinity of crime scene); *State v. Metzner*, 338 N.W.2d 799, 804–05 (N.D. 1983) (probable cause existed to search home of person suspected of possessing a weapon in violation of federal law where suspect "would logically be concerned that his possession of the weapon remain secret").

■ In this case, the interior of the home had been virtually eliminated as a hiding place by the federal search conducted a few days before the warrant application. The home's foundation, however, provided even greater privacy. Further, its lim-

ited accessibility was advantageous as a hiding place for a murder weapon, the next best option to disposing of or destroying it. Moreover, coincidence that defendant was constructing the foundation at the time of the murder provided him with a unique window of opportunity to conceal the weapon there. Once the weapon was placed in the foundation, defendant was unlikely to retrieve it, especially after he became the focus of the investigation. These factors were sufficient to allow the magistrate to make a common sense determination that there was a reasonable probability the murder weapon would be discovered in the foundation.

## II. The Nontestimonial Identification Order

Defendant argues that the trial court's nontestimonial identification order violated V.R.Cr.P. 41.1 and his state and federal constitutional rights against unreasonable searches and seizures and, consequently, that his refusal to comply with the order should have been suppressed.

## A. Rule 41.1

■ Defendant argues that the affidavit supporting the nontestimonial order failed to show that the requested procedure—taking samples of defendant's head and pubic hair—would "be of material aid" in determining whether he murdered the victim. V.R.Cr.P. 41.1(c)(3). He contends that, because the State had not tested the hair samples found in defendant's vehicle and on the victim's body at the time it requested the order, it did not know whether any foreign hairs useful for comparison had been recovered and, therefore, had no way of showing that the results of the procedure would be material.

■ Materiality cannot be considered in isolation. Rather, nontestimonial identification orders are evaluated like search warrants in a common sense manner under the totality of the circumstances. *State v. Evans*, 215 Neb. 433, 442, 338 N.W.2d 788, 794 (1983). Here, supporting affidavits met the first two parts of V.R.Cr.P. 41.1(c), showing probable cause that a crime had been committed and a reasonable suspicion that defendant had committed it. In the second part, the issuing judge found that probable cause rather than reasonable grounds supported

the suspicion, a showing stronger than V.R.Cr.P. 41.1(c)(2) requires.

Thus, the affidavits established that defendant was closely linked to the crime. The only issue posed by V.R.Cr.P. 41.1(c)(3), then, was whether, given the strength of the connection, defendant's hairs would be of material aid in proving or disproving his connection to the crime.

The supporting affidavits established that, because of the condition of the body—the victim's clothing had been partly removed, her jeans and panties were down to her knees—the murder had almost certainly been preceded by a rape, and that hairs had been recovered from the victim's clothing. Thus, the evidence sought—defendant's hair samples—was directly connected to the type of crime committed and to the evidence recovered at the crime scene.

The trial court found that the nontestimonial identification order was fully supported by probable cause, that is, that each of Rule 41.1(c)'s three prongs was met by that standard. Defendant does not challenge this conclusion, and we therefore need not reach the issue of whether probable cause, reasonable suspicion, or some lesser standard is required by subsection (c)(3).

Rather, defendant argues that the requirement that an identification procedure "will be of material aid" is higher than even the *Brown* standard for probable cause, that is, it must be a virtual certainty that the test results will be material. As defendant acknowledges, however, subsection (c)(3) focuses less on the probative value of the procedure than on its materiality. See 1 J. Strong, McCormick on Evidence § 185, at 773–74 (4th ed. 1992) (distinguishing between materiality and probative value: materiality refers "to the relation between the propositions for which the evidence is offered and the issues in the case," while probative value refers to the "tendency of evidence to establish the proposition that it is offered to prove"). Subsection (c)(3) demands that the proponent of a nontestimonial identification procedure show materiality, but it sets the threshold for probative value of the test very low. The evidence to be gained from the test must only "aid" in determining the material issue, the identity of the perpetrator.

There is no doubt that when the victim and the accused have come into close contact and hair samples are found on a victim's body, comparing that hair with the accused's will be of material aid to determining whether he is properly a suspect. Indeed, defendant himself called a witness to testify that the hairs taken from his vehicle did not match the victim's and, in closing argument, relied heavily on the lack of a hair-sample match to try to cast reasonable doubt on his identification as the murderer.

■ Rule 41.1(c)(3) imposes no obligation that the police eliminate the victim or anyone else as the source of the hairs, as long as defendant could be the source. Protection for the accused comes (1) from the concept of materiality, which requires a logical connection between the type of evidence sought and the capacity of that evidence to be useful in proving or disproving the case against defendant; (2) from the first two requirements of the rule, which focus on the likelihood that the accused is the perpetrator; and (3) from review of the request by a detached magistrate. The only issue under Rule 41.1(c)(3) is whether defendant's link to the crime—already established under the first two parts of the rule—will be strengthened or weakened by the hair sample comparison.

The chief case relied on by defendant, *Mulder v. State*, 707 S.W.2d 908, 916 (Tex. Crim. App. 1986) (en banc), is factually distinguishable. In *Mulder*, the court held it was error to have required that defendant submit a blood sample because, although blood was found at the crime scene, the affidavits did not state that defendant had been wounded or otherwise lost blood. There is no reason to assume, absent such an allegation, that one committing burglary and attempted murder will leave blood at the crime scene. In the case of rape, however, hair is often exchanged between victim and perpetrator. There is a logical connection between the items sought—head and pubic hairs—and the crime of rape. When the crime is a violent one involving a strong possibility that hairs will be exchanged between perpetrator and victim, the hair comparison will be of material aid.

## B. Article Eleven and the Fourth Amendment

Defendant asserts that the federal and state constitutions require a different and higher standard than Rule 41.1. Specifically, citing *Schmerber v. California*, 384 U.S. 757, 770 (1966), he contends that searches involving intrusions into the human body must pass a "clear indication" test.

*Schmerber* requires that a police officer may not make a warrantless search "beyond the body's surface" absent a clear indication that evidence of a crime will be found. *Id.* at 769–70. Defendant is not entitled, as a matter of federal law, to the *Schmerber* test because removal of head and pubic hair does not involve such an intrusion. See *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 617 (1989) (distinguishing collection of a urine sample from *Schmerber* blood-testing procedures that involved "a surgical intrusion into the body").

We hold, however, that the removal of pubic hair, involving an area of the body that is traditionally concealed from public view, implicates Article 11 of the Vermont Constitution. See *State v. Kirchoff*, 156 Vt. 1, 10, 587 A.2d 988, 994 (1991) ("Article 11 protects the people of the state 'from unreasonable, warrantless governmental intrusion into affairs which they choose to keep private.'") (quoting *State v. Zaccaro*, 154 Vt. 83, 91, 574 A.2d 1256, 1261 (1990)); see also *Skinner*, 489 U.S. at 617 (collection of a urine sample implicates the Fourth Amendment because urination in public is proscribed by law and social custom). Thus, in the absence of a valid exception, seizure of pubic hairs requires a warrant issued upon probable cause.

Because it transfers decision making from the police to a neutral judicial officer, a nontestimonial identification order serves the function of a search warrant. Defendant does not challenge the use of a nontestimonial order, but instead insists that the order was invalid because it was not supported by the probable cause standard of *Brown*, 151 Vt. at 535 n.2, 562 A.2d at 1058–59 n.2. For reasons stated in Part I, we decline to apply that standard.

The affidavit supporting the nontestimonial order established that (a) a murder, almost certainly preceded by rape, had been committed; (b) probable cause existed to believe de-

fendant committed the crime; (c) unidentified hairs were recovered from the victim's clothes. Examined in a common sense manner, these facts provide probable cause to support the order. See *State v. Cobb*, 295 N.C. 1, 19–20, 243 S.E.2d 759, 770 (1978) (obtaining pubic hair samples from defendants arrested for first degree rape was reasonable); *Commonwealth v. Robson*, 461 Pa. 615, 628–29, 337 A.2d 573, 580 (1975) (court found probable cause to believe sample of defendant's pubic hair would provide evidence concerning the crime where there was probable cause that he murdered victim and that sexual activity had occurred).

Defendant remarks in passing that the clear indication test may require more than probable cause. He does not, however, explain how that test is more stringent. Moreover, he does not explain why Article 11, unlike its federal counterpart, should apply a clear indication test to intrusions that do not go beyond the body's surface nor why that test, which was used in *Schmerber* to evaluate the reasonableness of a warrantless search, should apply here where the nontestimonial identification order functioned as a warrant. We decline to reach these issues because they have been inadequately briefed.

### III. The *Miranda* Waiver

Defendant claims that the State failed to demonstrate he waived his *Miranda* rights prior to making statements to the police on October 21, 1986, and that the statements, therefore, should have been suppressed. Specifically, defendant contends that (a) his waiver was "ambiguous or equivocal," and the police breached their duty to seek clarification of the precise nature and extent of the waiver; (b) the police refused to disclose the underlying subject of the interrogation; (c) the State failed to prove a waiver beyond a reasonable doubt; and (d) his prior representation by counsel on a New Hampshire fugitive charge that served as a vehicle for defendant's arrest and custodial questioning made invalid any subsequent waiver by defendant of his right to counsel.

On October 21, 1986, state police, in possession of a New Hampshire fugitive warrant and aware that defendant carried a firearm in violation of federal law, stopped and arrested him on Interstate 89 in South Burlington. Defendant was handcuffed,

placed in a police cruiser, and read his *Miranda* rights. When asked if he understood his rights, defendant acknowledged that he did. The police then drove him to the police barracks asking no questions en route.

Upon arriving at the barracks, the officers took defendant to an interview room and, for the second time, read him his *Miranda* rights. Defendant once again acknowledged that he understood his rights. He was then asked the standard question from the form utilized by the police in the second *Miranda* reading: "With these rights in mind, do you want to talk to me now?" to which he replied, "Yes to find out what it's about."

The police did not explain the purpose of the questioning but, instead, proceeded to ask defendant about his whereabouts on the day Paulette Crickmore disappeared. Defendant stated that on that day he was on vacation and may have driven on the Jericho Road from Richmond to Route 15 and Eden. When the subject of a polygraph test was discussed, defendant expressed his desire to have an attorney present, and the interview was terminated.

Prior to trial, defendant moved to suppress his statements to the police on the ground that the State could not establish he had made a knowing, intelligent and voluntary waiver of his *Miranda* rights. The trial court denied the motion.

## A. The Waiver

Defendant argues that his statement, "Yes to find out what it's about," was too ambiguous or equivocal to constitute a waiver of his *Miranda* rights.

In *Miranda v. Arizona*, 384 U.S. 436, 475 (1966), the United States Supreme Court ruled that, where the State relies on an individual's statements, it bears "a heavy burden . . . to demonstrate that the defendant knowingly and intelligently" waived the right against self-incrimination and the right to counsel before making those statements. Further, *Miranda* will not allow an inference of waiver to be drawn "simply from the silence of the accused." *Id.*

This Court has held that an analysis of waiver requires a "'totality-of-the-circumstances approach.'" *State v. Malinowski*, 148 Vt. 517, 520, 536 A.2d 921, 923 (1987) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). That approach

"permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the [defendant's] age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights."

*Id.* On appeal, "the trial court's findings [on waiver] must stand if they are supported by substantial credible evidence and are not clearly erroneous." *Id.*

The trial court weighed a number of factors in determining that defendant voluntarily, knowingly and intelligently waived his *Miranda* rights. It highlighted, among other factors, defendant's age, his prior contacts with the police,[1] his prior representation by counsel on at least one other occasion pursuant to a major felony charge, and two statements made on the day of questioning that he understood his *Miranda* rights. It accorded additional persuasive weight to the fact that defendant answered questions posed to him until the subject of a polygraph test arose, observing that he then "promptly terminated the discussion and requested a lawyer." The court stated, "These are not the actions of a man unclear as to whether he will remain silent."

The court concluded that

[defendant's] words 'Yes to find out what it's about' are an express waiver of the defendant's right to remain silent and to have an attorney present. He said 'yes,' meaning he was willing to talk to the officer. Furthermore, having his 'rights

---

[1] Defendant challenges the trial court's finding that he had prior interactions with police, arguing that the evidence underlying the finding was hearsay. But the rules of evidence do not apply to preliminary suppression hearings. See V.R.E. 104(a); *United States v. Matlock*, 415 U.S. 164, 172–75 (1974). Moreover, because the hearsay evidence underlying the finding was reliable, the trial court did not err in considering it. The evidence consisted of testimony of the arresting officer that defendant had had several prior contacts with the police. This testimony was based on information the officer acquired from court documents pertaining to defendant's federal trial for gun-law violations, from conversations with other police officers, defendant's parole officer and defendant himself, from computer checks conducted at the Vermont Crime Information Center, and from an FBI check.

in mind,' he was willing to talk to the officer in order to find out 'what it's about,' meaning he would talk until he found out what it was about, at which point he would decide whether or not to stop talking.

Ample evidence supported the trial court's conclusion that defendant had unequivocally waived his *Miranda* rights.

In *Connecticut v. Barrett*, 479 U.S. 523 (1987), the United States Supreme Court explained that the "fundamental purpose of the Court's decision in *Miranda* was 'to assure that *the individual's right to choose* between speech and silence remains unfettered throughout the interrogation process,'" *id.* at 528 (quoting *Miranda*, 384 U.S. at 469) (emphasis in *Barrett*), and stressed that interpretation of a statement of waiver "is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous." *Id.* at 529. Authorities are not required "to ignore the tenor or sense of a defendant's response to [*Miranda*] warnings." *Id.* at 528.

Defendant here indicated that he wanted to speak. Although he indicated that he wished to do so for a particular purpose, the words, nonetheless, expressed unambiguously a willingness to speak. Because there was no ambiguity, the police breached no duty to clarify.

Cases cited by defendant in support of his argument are factually dissimilar. See *United States v. Pena*, 897 F.2d 1075, 1077–78 (11th Cir. 1990) (after twice declining to discuss events with authorities and ultimately signing a waiver form, defendant said, in response to a request that he cooperate in questioning, "I want to. I really want to but I can't. They will kill my parents."); *Christopher v. Florida*, 824 F.2d 836, 840 (11th Cir. 1987) (questioning continued despite repeated invocations of the right to remain silent, including the statement, "Okay then. I got nothing else to say."); *Martin v. Wainwright*, 770 F.2d 918, 923 (11th Cir. 1985), *modified*, 781 F.2d 185 (11th Cir. 1986) (defendant stated, "Can't we wait until tomorrow," but police, nonetheless, proceeded with questioning); *United States v. Johnson*, 558 F.2d 1225, 1227 (5th Cir. 1977) (defendant made contemporaneous statements, expressing both an intent to remain silent until receiving advice of counsel and a desire to cooperate by offering an explanation of events).

## B. The Failure to Inform

■ ■ Defendant argues next that the police refused to disclose the subject of the interrogation, in violation of the federal and Vermont constitutions. A *Miranda* waiver voluntarily, knowingly and intelligently made will not be deemed invalid solely because the police failed to inform an individual of the purpose of the interrogation. *Colorado v. Spring*, 479 U.S. 564, 576–77 (1987). Defendant attempts to circumvent *Spring* by characterizing his response, "Yes to find out what it's about," as a question about the subject matter of the interrogation and by arguing that, in failing to inform him, the police impermissibly *refused* to inform him of the true object of the questioning. Defendant's affirmation that he was willing to talk to inform himself was not a direct inquiry obligating the police to respond. Thus, there was no refusal as defendant contends.

■ Defendant also argues that he was misled because he was arrested on the New Hampshire warrant, but subsequently questioned about the Crickmore murder. This contention is not factually supported. Nothing in the trial court's findings or the record indicate that defendant was told the grounds for his arrest. Thus, that the police had a New Hampshire warrant and that they knew he was committing a federal felony could not have served to mislead defendant about the subject matter of the interrogation.

## C. The Burden of Proof

■ Defendant's assertion that Chapter I, Article Ten of the Vermont Constitution requires proof of waiver beyond a reasonable doubt is foreclosed by our decision in *State v. Caron*, 155 Vt. 492, 504, 586 A.2d 1127, 1134 (1990) (holding to the contrary).

## D. New Hampshire Counsel

■ Defendant stresses that, because the New Hampshire fugitive warrant served as a vehicle for his arrest and custodial questioning, his prior representation by counsel on the sexual assault charge underlying the warrant made invalid any possible subsequent waiver of his right to counsel. This argument was not made to the trial court and will not be considered here

unless it reveals plain error. *State v. Olson,* 153 Vt. 226, 235, 571 A.2d 619, 624 (1989).

The record does not disclose whether, at the time of the New Hampshire sexual assault charge, defendant invoked his right to counsel pursuant to the Fifth Amendment to the United States Constitution, so we need not consider the issue with respect to that provision. See *Morse v. Morse,* 126 Vt. 290, 292, 229 A.2d 228, 230 (1967) (facts outside the record cannot be considered by this Court). At most, it may be presumed that counsel was appointed pursuant to the Sixth Amendment.

 To the extent that defendant relies on this Sixth Amendment right to counsel, his argument is foreclosed by the United States Supreme Court's decision in *McNeil v. Wisconsin,* — U.S. —, 111 S. Ct. 2204 (1991). *McNeil* held that the Sixth Amendment right to counsel is offense specific, *id.* at —, 111 S. Ct. at 2207, and defendant himself emphasizes that the October 21, 1986 questioning was not related to the New Hampshire charge. Thus, defendant has failed to demonstrate that questioning without counsel constituted any error, certainly not plain error.[2]

## IV. The Arrest

Defendant challenges the legality of his arrest. He argues that there was no valid basis for the arrest because the New Hampshire warrant under which he was arrested violated an earlier plea agreement and because the arresting officer had no authority to arrest him for a federal felony. He contends that the arresting officer detained him to question him about the Crickmore murder, a crime the officer did not have probable cause to believe he committed. Therefore, defendant argues, the arrest was a pretext and illegal whether or not the officer had otherwise valid grounds for the arrest.

### A. Validity of the Grounds for the Arrest

 Defendant contends that there was no valid ground for his arrest. The police arrested defendant on a six-year-old New

---

[2] Defendant has not argued that any provision in the Vermont Constitution grants him greater rights than the Sixth Amendment to the United States Constitution. Accordingly, we express no opinion on that issue.

Hampshire fugitive warrant. The underlying offense was a sexual assault charge that New Hampshire authorities had agreed to drop when defendant pled guilty to a sexual assault charge in Vermont. At the time of the arrest, however, the officers also had probable cause to believe that defendant possessed a firearm, in violation of federal law. The trial court found the arrest was properly grounded on the federal felony. We agree and do not reach the validity of the New Hampshire warrant.

The trial court found that "the officers knew that the Defendant was a convicted felon and that he possessed a firearm in the vehicle." Defendant acknowledges that possession of a firearm by a convicted felon violates federal law. He also recognizes that state law enforcement agents may perform an arrest for a violation of federal law in conjunction with federal agents. Defendant contends, however, that state law enforcement officers may not independently make arrests for federal felonies. A number of federal courts have stated in dicta that state officers may make warrantless arrests for violations of federal law as long as the arrests are lawful under state law. See *United States v. Bowdach*, 561 F.2d 1160, 1168 (5th Cir. 1977); *United States v. Swarovski*, 557 F.2d 40, 49 (2d Cir. 1977). These decisions rest on United States Supreme Court cases holding that arrests for violations of federal law by state officers accompanied by federal agents having no power to arrest are lawful as long they conform to state law. See *Miller v. United States*, 357 U.S. 301, 305 (1958); *United States v. Di Re*, 332 U.S. 581, 591 (1948).

Vermont law authorizes law enforcement officers to arrest without a warrant "when the officer has probable cause to believe a person has committed or is committing a felony." V.R.Cr.P. 3(a)(1). The rule does not limit an officer's authority to make arrests where probable cause exists to believe that a *state* felony was or is being committed, and we conclude that it permits state officers to make an arrest without a warrant where they have probable cause to believe that a federal felony is being or has been committed. See *Swarovski*, 557 F.2d at 46–47 ("great weight of opinion in the federal courts and in the courts of the State of New York, as well as the understanding and practice of the executive branches of the federal and state governments" supports the view that New York statutes authorizing arrest of person in the act of committing a felony in

the state apply to federal as well as state felonies); see also *United States v. Janik*, 723 F.2d 537, 548 (7th Cir. 1983) (Illinois officers' implicit authority to make federal arrests inferred because an arrest had never been invalidated by a court where state officers made a federal arrest). Because the arrest was valid under state law, under the reasoning of *Swarovski* and *Bowdach*, it was also valid under federal law.

That defendant was arrested without a warrant does not alter the validity of the arrest. The United States Supreme Court has recognized the prevailing common-law rule permitting warrantless arrest for a "felony committed in [a peace officer's] presence as well as for a felony not committed in his [or her] presence if there was reasonable ground for making the arrest." *United States v. Watson*, 423 U.S. 411, 418 (1976). This well-established rule should apply equally where a state officer makes a federal felony arrest. Because state law enforcement officers may arrest for federal offenses pursuant to arrest warrants issued by state judicial officers, we conclude that a state law enforcement officer, who has a reasonable belief that a federal felony has been or is being committed, may make a warrantless arrest.

### B. Pretext

Defendant argues that he was detained solely because the arresting officer wished to question him about the Crickmore murder and that therefore his arrest was invalid. He bases this claim on the arresting officer's testimony that, subsequent to the arrest, defendant was interrogated about the Crickmore murder and not about the alleged New Hampshire offense. The record contains no evidence, however, of the officer's purpose in making the arrest, and the trial court made no finding of pretext, noting the difficulty in determining an officer's subjective intent.

No Vermont case examines the effect of an allegedly pretextual motive on an otherwise valid arrest. The majority of federal circuits considering the issue have interpreted recent United States Supreme Court decisions as limiting Fourth Amendment analysis to an examination of the objective legality of the arrest. *United States v. Cummins*, 920 F.2d 498, 501 (8th

Cir. 1990); *United States v. Hernandez*, 901 F.2d 1217, 1219 (5th Cir. 1990); *United States v. Trigg*, 878 F.2d 1037, 1041 (7th Cir. 1989); *United States v. Hawkins*, 811 F.2d 210, 215 (3d Cir. 1987).[3] The test involves a two-pronged inquiry: "First, did the arresting officer have probable cause to believe that the defendant had committed or was committing an offense. Second, was the arresting officer authorized by state and or municipal law to effect a custodial arrest for the particular offense." *Trigg*, 878 F.2d at 1041.

 In this case, defendant, a convicted felon, was being investigated as the prime suspect in the Crickmore murder. During that investigation, police learned that he was subject to a New Hampshire fugitive warrant and that he was carrying a firearm, a federal felony. The arresting officer had probable cause to believe a felony had been and was being committed; he was, therefore, authorized under state law to perform a warrantless arrest. Under the circumstances, the arrest was valid.[4]

### V. The Information

The information stated that defendant

> on or about 10 Sept. 1986, was then and there a person who wilfully, deliberately, and with premeditation did kill another, to wit: Paulette Crickmore, by shooting her three times in the head, thereby causing her death, in violation of Title 13, Section 2301, Vermont Statutes Annotated.

Defendant contends that, because the information does not include either the word "malice" or the word "murder," it was insufficient and charged him only with manslaughter.

---

[3] But see *United States v. Guzman*, 864 F.2d 1512, 1517 (10th Cir. 1988); *United States v. Smith*, 799 F.2d 704, 709 (11th Cir. 1986) (taking the minority position that a stop is legal if a reasonable officer would have made it absent the allegedly improper motive). We follow the majority position because it more closely follows United States Supreme Court precedent that Fourth Amendment analysis should involve "an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time." *Scott v. United States*, 436 U.S. 128, 136 (1978).

[4] Defendant has not suggested that pretext analysis under the Vermont Constitution differs from that under the Fourth Amendment to the United States Constitution. Accordingly, we do not reach that issue.

■ An information must "'set forth charges with such particularity as will reasonably indicate the exact offense the accused is charged with, and will enable [him] to make intelligent preparation for [his] defense.'" *State v. Cantrell*, 151 Vt. 130, 137, 558 A.2d 639, 643 (1989) (quoting *State v. Bradley*, 145 Vt. 492, 495, 494 A.2d 129, 131 (1985)). It must "state the essential elements of the offense." *State v. DeLaBruere*, 154 Vt. 237, 276, 577 A.2d 254, 276 (1990).

■ The information cited 13 V.S.A. § 2301, the provision describing the difference between first- and second-degree murder, and tracked the statutory description of murder in the first degree. Thus, the essential elements were included. See *State v. Johnson*, 158 Vt. 508, 519, 615 A.2d 132, 138 (1992) (malice has "no real meaning other than denoting various mental states"). The information reasonably indicated the exact offense of first degree murder and permitted defendant to make intelligent preparation for his defense.

Because we hold that the information was sufficient, we do not reach defendant's second claim, that the court erred by allowing the State to amend the information after the close of the State's evidence.

*Affirmed.*

**Morse, J.,** concurring. I concur and would also affirm, but disagree with the Court's rejection, in Part I, of *State v. Brown*, 151 Vt. 533, 562 A.2d 1057 (1989), on the ground that its standard requires "a rigid quantitative analysis for determining probable cause." I would not overrule the *Brown* probable cause standard. I will admit, however, that *Brown*'s author could have made the standard clearer.

I believe *Brown* was correctly decided and, under the facts and circumstances there, any test less stringent than "more likely than not" would be unwarranted. This case presents similar circumstances, the *Brown* standard fits the case, and we not need deviate from it.

In *Brown*, there was evidence that a crime—felony possession of marijuana—had been committed and evidence—marijuana plants and defendant's statements to neighbors—linking him to the crime. Based on this evidence, we ruled that a search

warrant was justified because marijuana or evidence of its use or sale would more likely than not be found on defendant's premises. The premises included the residence and "unoccupied sheds, storage buildings, trailers and junk autos." *Id.* at 534, 562 A.2d at 1058. We wrote:

> The standard of probable cause may depend on the nature of the matter under consideration—e.g., whether a crime has been committed, whether a particular person has committed it, whether evidence of crime is to be found in a particular place, and so on. See generally 1 W. LaFave, Search and Seizure § 3.2(e) (2d ed. 1987). Our holding that the standard for "probable cause" is "more likely than not" is limited to situations, such as that obtaining here, where the pertinent inquiry is whether evidence of a crime will be found *in a particular place.*

*Id.* at 535 n.2, 562 A.2d at 1059 n.2 (emphasis added).

The words "in a particular place" were an inartful way of describing everything included in the premises that were the subject of the warrant application, that is, the residence and "sheds, storage buildings, trailers and junk autos." The holding must be reasonably read in light of the facts of the case. If defendant in *Brown* had had other places to conceal the contraband, those too would have fallen under the rubric of "premises." I view the "more likely than not" standard as applying to the likelihood of finding the sought-after fruits of the crime in any hiding place available to defendant. Exclusive focus on a particular place is not a necessary part of the *Brown* standard.

As stated in *Brown*, the standard of probable cause depends on the nature of the search's objective. The objective here was similar to *Brown*. There was strong evidence that a crime had been committed and strong evidence linking defendant to that crime. The police sought an instrumentality of the crime at defendant's premises, including the foundation or anywhere else available to defendant to stash the gun. The *Brown* standard was satisfied in this case, and we should affirm on that basis. Given the relatively narrow focus of places to search in *Brown*, it would have been unacceptable to define probable cause as less than a preponderance. Unless we struggle to give probable

cause a reasonably tight definition in specific circumstances, it may become a mere hunch in all circumstances.

The standard of probable cause may, depending on the circumstances, differ from the *Brown* standard, but this issue should be left to future cases, keeping in mind the role probable cause plays in protecting privacy. See 1 W. LaFave, Search and Seizure § 3.2(e), at 601 (2d ed. 1987) ("fair compromise between privacy and law enforcement interests" in determining probable cause depends on how "substantial [the] danger that the privacy of an innocent person will be invaded").