2013 VT 90

# In re Edwin Towne

[86 A.3d 429]

No. 12-162

Present: **Reiber, C.J., Dooley, Skoglund, Burgess** and **Robinson, JJ.**

Opinion Filed October 4, 2013

*Matthew F. Valerio*, Defender General, *Dawn Matthews*, Appellate Defender and *Nick Wanger*, Legal Intern, Montpelier, for Petitioner-Appellant.

*William H. Sorrell*, Attorney General, and *John Treadwell*, Assistant Attorney General, Montpelier, for Respondent-Appellee.

¶ 1. **Reiber, C.J.** Petitioner Edwin Towne appeals the trial court's denial of his request for post-conviction DNA testing under Vermont's Innocence Protection Act, 13 V.S.A. § 5561. We affirm the denial because the court correctly concluded that the results of the requested test would not have created a "reasonable probability" of a different outcome at trial.

¶ 2. Petitioner was convicted of murder in 1989. This Court affirmed petitioner's conviction on direct appeal in 1992. *State v. Towne*, 158 Vt. 607, 615 A.2d 484 (1992). Since that time, petitioner has filed at least ten requests for post-conviction relief, all of which have been denied. See *Towne v. Hofmann*, No. 2008-095, 2008 WL 3976483, at *1 (Vt. Aug. 21, 2008) (unpub. mem.), https://www.vermontjudiciary.org/UPEO2006-2010/eo08-095.pdf. In 2011, petitioner requested that hairs found on the victim's body be tested for mitochondrial DNA (mtDNA). If the results matched neither petitioner nor the victim, petitioner asked that authorities be ordered to obtain a sample from petitioner's

former girlfriend's son, whom petitioner maintains committed the murder. After reviewing the evidence in petitioner's trial, the court rejected petitioner's testing request and granted the State's motion for summary judgment because petitioner could not show a reasonable probability that DNA results from the hair would have resulted in a different outcome at trial. The court noted that it could not compel the son to produce a sample; but it held that even if the son voluntarily did so, or if the son's DNA was already present in the DNA computer registry for comparison, "[a]ll that can be said with reasonable certainty is that DNA evidence showing that [the son's] hair was present on the scene would be a point in favor of the defense, subject like most points to conflicting interpretations. . . . The presence of hair from [the son] on the victim's body would open a range of possible explanations without excluding [petitioner] as the guilty party."

¶ 3. On appeal, petitioner contends that the trial court misapprehended the applicable standard for granting post-conviction relief and that the DNA results would, in fact, have led to a reasonable probability of a more favorable outcome.

## I.

¶ 4. We have not previously addressed either the standard to be applied by the trial court in deciding a request for post-conviction DNA testing under the act or, indeed, our own standard for reviewing a trial court's resolution of that request. See *In re Wiley*, 2012 VT 76, ¶ 7, 192 Vt. 393, 58 A.3d 966. In this case, we consider only the first question, the appropriate standard for the trial court to apply, because we are bound to apply the same standard as the lower court when reviewing the grant of summary judgment. *Richart v. Jackson*, 171 Vt. 94, 97, 758 A.2d 319, 321 (2000).

¶ 5. Determining the appropriate standard for considering requests under the Innocence Protection Act is a question of statutory construction and, therefore, a pure question of law that we review de novo. See *Smith v. Desautels*, 2008 VT 17, ¶ 12, 183 Vt. 255, 953 A.2d 620 (noting that statutory construction "is a pure question of law"). As with all matters of statutory interpretation, legislative intent is paramount. See *Pease v. Windsor Dev. Review Bd.*, 2011 VT 103, ¶ 17, 190 Vt. 639, 35 A.3d 1019 (mem.).

¶ 6. ■ The Innocence Protection Act provides a right to post-conviction testing under certain enumerated circumstances. See 13

V.S.A. § 5561 et seq. Before a trial court may grant a contested request for DNA testing, it must find, among other things, that:

> A *reasonable probability* exists that the petitioner would not have been convicted or would have received a lesser sentence for the crime which the petitioner claims to be innocent of in the petition if the results of the requested DNA testing had been available to the trier of fact at the time of the original prosecution.

13 V.S.A. § 5566(a)(1) (emphasis added).

¶ 7. A robust body of case law has sought to define the contours of the "reasonable probability standard" in the context of claims of ineffective assistance of counsel and improper failure to disclose exculpatory evidence. See *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (explaining in federal constitutional claim based on prosecution's failure to disclose exculpatory evidence that "touchstone of materiality is a *'reasonable probability'* of a different result" (emphasis added) (discussing *United States v. Bagley*, 473 U.S. 667 (1985), and *Brady v. Maryland*, 373 U.S. 83 (1963))); *Strickland v. Washington*, 466 U.S. 668, 694 (1984) (holding that prejudice prong of ineffective-assistance-of-counsel-claim is satisfied when defendant shows "a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (emphasis added)); *In re Dunbar*, 162 Vt. 209, 212, 647 A.2d 316, 319 (1994) (noting same "reasonable probability" standard); *State v. Gibbons*, 146 Vt. 342, 344, 503 A.2d 540, 541 (1985) (applying *Bagley* materiality standard). "[A]s Justice Frankfurter advised, 'if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.'" *Evans v. United States*, 504 U.S. 255, 260 n.3 (1992) (quoting F. Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947)). That is to say, absent evidence to the contrary, we presume that the Legislature was familiar with our long-standing interpretation of the phrase "reasonable probability" when it promulgated the Innocence Protection Act, and thus intended to adopt that standard. See *Fletcher Hill, Inc. v. Crosbie*, 2005 VT 1, ¶ 17, 178 Vt. 77, 872 A.2d 292 (noting presumption in similar context); accord *State v. Dupigney*, 988 A.2d 851, 859 (Conn. 2010) (adopting as appropriate standard for post-conviction DNA testing the same standard employed in the prejudice prong of ineffective-

assistance-of-counsel-claim inquiries and in resolving alleged *Brady* violations).

¶ 8. ■ We hold that under our Innocence Protection Act, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694 (discussing "reasonable probability" in the context of the prejudice prong of an ineffective-assistance-of-counsel claim). A petitioner must demonstrate that the evidence " 'creates a reasonable doubt that did not otherwise exist.' " *State v. Goyette*, 156 Vt. 591, 598, 594 A.2d 432, 436 (1991) (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)). As other courts have observed, this is not a sufficiency of the evidence test. See, e.g., *Dupigney*, 988 A.2d at 858 ("[T]he focus is not whether, based upon a threshold standard, the result of the trial would have been different if the evidence had been admitted. We instead concentrate on the overall fairness of the trial and whether [the unavailability] of the evidence was so unfair as to undermine our confidence in the jury's verdict." (quotation omitted)). A reasonable probability is "a reasonable chance and not merely an abstract possibility." *Richardson v. Super. Ct.*, 183 P.3d 1199, 1205 (Cal. 2008) (adopting same standard in the context of its own post-conviction DNA-testing statute).

¶ 9. When determining if the petitioner has shown a reasonable probability of a different outcome, a court must take into account all of the evidence before the jury, considering the trial as it actually unfolded. See *Strickland*, 466 U.S. at 695. In the context of an ineffective-assistance-of-counsel claim, the United States Supreme Court has offered the following guidance for reviewing the factual record:

> Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant

has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id.* at 695-96.

¶ 10. ■ We take this opportunity to clarify that a petitioner seeking post-conviction DNA testing under the Innocence Protection Act does not need to show by a "preponderance of the evidence that there is a reasonable probability" of a different outcome. See *In re Grega,* 2003 VT 77, ¶ 7, 175 Vt. 631, 833 A.2d 872 (mem). The difference in standards may be subtle, but is nonetheless of sufficient importance to warrant the U.S. Supreme Court's explicit clarification that the reasonable probability standard is a less onerous one than a preponderance of the evidence standard. See *Strickland,* 466 U.S. at 694 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."); see also *Williams v. Taylor,* 529 U.S. 362, 405-06 (2000) (explaining that a preponderance of the evidence standard would be "opposed to our clearly established precedent . . . that the prisoner need only demonstrate a reasonable probability that . . . the result of the proceeding would have been different" (quotation omitted)).

¶ 11. ■ Similar to the U.S. Supreme Court, we previously rejected — albeit in a nonprecedential manner — this precise accumulation of standards in the context of the prejudice prong of an ineffective-assistance-of-counsel claim for two reasons: one, because of the difficulty in defining what this awkward construction would mean in practice, and, two, because of the further difficulty it would engender in ascertaining on review whether a trial court applied the correct standard. See *In re Combs,* No. 2012-027, 2012 WL 2880535, at *3 (Vt. July 11, 2012) (unpub. mem.) ("[I]n ruling that petitioner here failed to 'prove by a preponderance of the evidence that there was a reasonable probability' of a different outcome, the trial court conflated the preponderance and reasonable-probability standards that the [U.S.] Supreme Court has carefully distinguished, and rendered it

impossible to determine which standard the court applied."[1]). The same concerns exist in the case of DNA testing. Therefore, we eschew the preponderance standard in this context and adopt the *Strickland* standard that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

## II.

¶ 12. Having established the appropriate standard of review, we consider the trial court's resolution on cross-motions for summary judgment of petitioner's request. Summary judgment is appropriate if a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a). "This Court reviews a grant of summary judgment de novo, employing the same standard as the trial court."[2] *In re Barrows*, 2007 VT 9, ¶ 5, 181 Vt. 283, 917 A.2d 490.

¶ 13. As the trial court correctly recited, the determinative question in this case is whether — assuming, as we must, the best case scenario for petitioner — the undisputed material facts would demonstrate a reasonable probability of a different outcome at trial. Under the reasonable probability standard, we ask whether the results petitioner desired from the DNA test would be "sufficient to undermine confidence in the outcome" of the trial.

---

[1] We acknowledge that we have, on occasion, mistakenly described a petitioner's burden in establishing the prejudice prong of an ineffective-assistance-of-counsel claim using precisely the erroneous terms we explicitly reject today. See *Grega*, 2003 VT 77, ¶ 7 ("[A] petitioner must show by a preponderance of the evidence that . . . there is a reasonable probability that, but for counsel's unprofessional errors, the proceedings would have resulted in a different outcome."); *In re Plante*, 171 Vt. 310, 313, 726 A.2d 873, 876 (2000) (same). Although the confusing wording did not in any of these previous cases alter the legally correct outcome, we here clarify so as to avoid any future confusion.

[2] Since we review de novo, it is not critical to determine whether the trial court applied the correct standard in this case. In any event, we do not, as petitioner urges, take the trial court's extraneous language with respect to the exculpatory value of DNA evidence in sex-assault cases to mean that it misunderstood the standard. To the extent that the court observed that DNA derived from semen not matching an alleged perpetrator of a sexual assault might tend to completely exonerate a defendant by virtue of the specific physical nature of such an attack, the trial court merely did so to demonstrate the opposite extreme along the spectrum of confidence in a jury's conclusion. The trial court correctly concluded that petitioner failed to carry his burden under the traditional understanding of the standard commanded by the term "reasonable probability."

*Strickland,* 466 U.S. at 694. Based on the totality of the evidence at petitioner's murder trial, no possible result of the available tests would sufficiently undermine our confidence in the verdict to warrant reversal.

¶ 14. As a threshold matter, we note that petitioner requested mitochondrial DNA testing, not nuclear DNA testing.[3] MtDNA offers certain forensic advantages by virtue of its relative cellular abundance. See *United States v. Beverly,* 369 F.3d 516, 528-29 (6th Cir. 2004). In *Beverly,* the United States Court of Appeals for the Sixth Circuit discussed the scientific basis for these advantages:

> [W]hile any given cell contains only one nucleus, there are a vast number of mitochondria. As a result, there is a significantly greater amount of mtDNA in a cell from which a sample can be extracted by a lab technician, as compared to nuclear DNA. Thus, this technique is very useful for minute samples or ancient and degraded samples. In addition, mitochondrial DNA can be obtained from some sources that nuclear DNA cannot. For example, mtDNA can be found in shafts of hair, which do not have a nucleus, but do have plenty of mitochondria. Nuclear DNA can only be retrieved from the living root of the hair where the nucleus resides.

*Id.* at 529 (citation omitted).

¶ 15. But mtDNA also possesses certain inherent limitations. Its limited value to petitioner in this particular case is patent because of its inability to distinguish between matrilineal descendants. See *id.* ("MtDNA . . . is inherited only from the mother and thus all maternal relatives will share the same mtDNA profile, unless a mutation has occurred."). MtDNA testing would not definitively establish that any of the hairs on the victim's body came from petitioner's former girlfriend's son, who petitioner maintains actually committed the crime, but would instead indicate that the hairs could have come from him or any other people descended

---

[3] It does not appear from the record that the hairs would be useful for anything other than this limited mitochondrial testing. As petitioner recognized in his amended petition, the director of Vermont's forensic laboratory indicated by affidavit only that the hair samples unsuitable for microscopic analysis at the time of the trial "could [now] be subjected to mitochondrial DNA (mtDNA) analysis."

from a common matrilineal ancestor, including his mother. We conclude that a determination that the hair samples belonged to either defendant's former girlfriend or her son would not cause our confidence in the trial's outcome to waiver.

¶ 16. ▪ Although petitioner denies the potential import of the easy interpersonal transference of hair samples, jurors considered testimony from a defense witness premised on precisely that basis. At trial, the defense called an examiner from the Federal Bureau of Investigation who testified that none of the hair samples collected from defendant's car matched the victim's hair, according to a microscopic analysis. The testimony was presumably designed to call into doubt the idea that the victim had ever been in petitioner's car since hair is transferred easily, yet none of the victim's hair was found in the vehicle. The examiner testified that hair can be transferred between people and objects, offering examples of how that might occur. Even if mtDNA analysis established the hair samples belonged to the ex-girlfriend or her son, because petitioner shared a home with them, the examiner's testimony would have permitted jurors to weigh the possibility that petitioner himself was the agent for the deposition of the girlfriend's or son's hair onto the victim's body. The potential impact of this new DNA evidence is simply too speculative and remote to call into doubt the jury's verdict. See *Richardson*, 183 P.3d at 1205 ("[T]he defendant must demonstrate that, had the DNA testing been available, in light of all of the evidence, there is a reasonable probability — that is, a reasonable chance and not merely an abstract possibility — that the defendant would have obtained a more favorable result.").

¶ 17. The relative insignificance of any potential new evidence from the requested testing is compounded by the fact that a mtDNA match to petitioner's ex-girlfriend or her son would not contradict any evidence advanced by the State in its case. Indeed, the State presented no forensic evidence at trial that any of the hairs found on the victim's body came from petitioner, and no biological evidence implicating petitioner was found at the site where the body was discovered. To the extent that the jury was permitted to infer that a comparison of petitioner's own hair with the samples might have yielded a match, it did so based on petitioner's own refusal to submit to a nontestimonial order under Vermont Rule of Criminal Procedure 41. See *State v. Towne*, 158 Vt. at 612-13, 615 A.2d at 487. The trial court ruled that jurors

would be permitted to consider his refusal as evidence of guilt. *Id.* We will not speculate with respect to the possibility that petitioner might have pursued a different strategy involving compliance with the nontestimonial order. Even if the defense had been able to introduce mtDNA evidence indicating that the hairs on the victim's body belonged to someone other than petitioner, jurors would still have been able to weigh defendant's refusal, which — regardless of the actual results — might well indicate his concern that he could have been a match. He cannot now offer to cure his refusal by suggesting that he might have done so if DNA testing had been available.

¶ 18. ■ Petitioner's assertion that the State's case was circumstantial misapprehends the nature of our inquiry into the probability of a different outcome at trial. The relative strength of a particular case has clear import in analyzing the reasonable probability of a different outcome. See *Strickland*, 466 U.S. at 696 (noting that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support" in considering whether inadequate assistance of counsel constitutes prejudice). Here, however, a mtDNA match to the ex-girlfriend or her son would not alter the nature of the State's case because the DNA results would not call into question the evidence — circumstantial or otherwise — upon which the jury convicted. At trial, jurors heard evidence that defendant had driven the road where the victim was last seen alive on the morning of her disappearance. *Towne*, 158 Vt. at 612, 615 A.2d at 487. Testing revealed that the bullets removed from victim's body matched those fired from a gun petitioner purchased, and authorities discovered that gun hidden in one of the concrete blocks forming the foundation of the house petitioner was building. *Id.*

¶ 19. As part of his request for post-conviction DNA testing, petitioner posits that his ex-girlfriend's son had the means and opportunity to kill the victim. Petitioner stresses that the son lived with his mother and petitioner in Richmond and Eden. Petitioner points out that his ex-girlfriend and her son were present when he purchased the gun later identified as the murder weapon and that the son had fired it on at least one occasion. He also notes that the location of the house he was building was no secret to anyone and that the son assisted him in construction, affording the son access to the foundation pillar where authorities discov-

ered the weapon. And petitioner notes alleged inconsistencies in the testimony that provided the son with an alibi for the time of the abduction. Even assuming the truth of these assertions, the jury considered all of this testimony and evidence and nonetheless concluded that petitioner was guilty of the murder beyond a reasonable doubt. This evidence, regardless of how petitioner characterizes it, would remain the same even assuming the mtDNA analysis revealed the results for which petitioner hopes.[4]

¶ 20. ■ We conclude that the most substantial result the available testing could yield — that the hair came from the girlfriend, her son, or someone in their matrilineal lineage — would not sufficiently shake our confidence in the jury's verdict in light of the other evidence available to jurors in reaching their decision. The mtDNA tests petitioner seeks would not create a reasonable probability of a different outcome at trial.

*Affirmed.*

---

[4] We need not decide whether a test result definitively identifying the son as the source of the hair would create a reasonable probability of a different outcome. Given the available technology, that result is not possible.