AP-77,046
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 2/17/2015 7:34:26 PM
Accepted 2/18/2015 9:30:43 AM
ABEL ACOSTA
CLERK

No. AP-77,046
_____

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS
# AT AUSTIN
_____

**HENRY W. SKINNER,**
*Appellant*

**v.**

**THE STATE OF TEXAS,**
*Appellee*
_____

**On Appeal from the Finding Under
Tex. Code Crim. Proc. art 64.04 by
the 31st District Court of Gray County**
_____

**APPELLANT'S REPLY BRIEF**
_____

ROBERT C. OWEN
Texas Bar No. 15371950
Bluhm Legal Clinic
Northwestern University Law School
375 East Chicago Avenue
Chicago, IL 60611-3069
(312) 503-0135 voice
(312) 503- 8977 facsimile
robert.owen@law.northwestern.edu

DOUGLAS G. ROBINSON
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7800 office
(202) 393-5760 facsimile
douglas.robinson@skadden.com

*Counsel for Appellant*

Dated:  February 17, 2015

# TABLE OF CONTENTS

REPLY TO APPELLEE'S STATEMENT OF THE FACTS ...................................1

SUMMARY OF ARGUMENT IN REPLY .............................................5

ARGUMENT ....................................................................6

I.     This Court Should Reject the State's Articulation of the Applicable Legal Standards. .........................................................6

     A.     The convicting court's articulation of the governing legal standard was not a "mere[ ] ... affirmative restatement" of art. 64.04, but a wholesale inversion of the statute's language, and had the effect of requiring Mr. Skinner to show clear and convincing evidence of actual innocence..............................6

     B.     The Court should decline the State's invitation to superimpose a "preponderance of the evidence" requirement atop the "reasonable probability" standard. ......................................9

     C.     In arguing that the results of DNA testing on the blanket from Randy Busby's bed – which showed no trace of Mr. Skinner's DNA – are not exculpatory, the State invokes an erroneous recounting of the legislative history of art. 64.04. .............................14

     D.     Keeping faith with Texas's traditional emphasis on the importance of juries requires a standard of review that focuses on how a reasonable juror could evaluate the evidence......................18

II.    The State's Efforts to Downplay the DNA Test Results Favorable to Mr. Skinner Are Unavailing. ...............................................21

     A.     The finding by the State's expert that three hairs found in Twila Busby's hands were "visually dissimilar" from those of any of the victims cannot be casually brushed aside....................................21

     B.     The State fails in its effort to demonstrate that the absence of any finding of Mr. Skinner's DNA mixed with that of any of the victims anywhere but on the knife is not exonerating...................23

C.     The State fails to rebut Mr. Skinner's showing that the results of the testing on the dishtowel would have given him another basis for a finding of reasonable doubt. ...............................................24

III.    The State Exaggerates the Impact of the Test Results Showing Mr. Skinner's DNA Profile on the Knife and at Various Locations in the House. ...........................................................................................25

CONCLUSION.......................................................................................27

CERTIFICATE OF COMPLIANCE......................................................29

CERTIFICATE OF SERVICE ..............................................................30

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Carella v. California,* 491 U.S. 263 (1989) ...................................................................20

*Evans v. United States*, 504 U.S. 255 (1992) ................................................................6

*Lindstadt v. Keane*, 239 F.3d 191 (2d Cir. 2001) .......................................................7

*Lytle v. Household Manufacturing., Inc*., 494 U.S. 545 (1990) ............................20

*Nix v. Whiteside*, 475 U.S. 157 (1986) ..........................................................................7

*Purdy v. Zeldes*, 166 F. Supp. 2d 935 (D. Vt. 2001) ..............................................7

*Strickland v. Washington*, 466 U.S. 668 (1984) .......................................... 3, 5, 6, 19

*United States v. Dominguez Benitez*, 542 U.S. 74 (2004) .......................................7

*Williams v. Taylor*, 529 U.S. 362 (2000) ....................................................................7

*Youngblood v. West Virginia*, 547 U.S. 867 (2006) ...................................................7

## STATE CASES

*Boykin v. State*, 818 S.W.2d 782 (Tex. Crim. App. 1991) ......................................12

*Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010) .....................................20

*DeWitt v. Harris County*, 904 S.W.2d 650 (Tex. 1995) ..........................................12

*Hagos v. People*, 288 P.3d 116 (Colo. 2012) ............................................................7

*In re Towne*, 86 A.3d 429 (Vt. 2013)................................................................. 12, 14

*Kutzner v. State*, 75 S.W.3d 427 (Tex. Crim. App. 2002)................................ 15, 16

*Liverman v. State*, 448 S.W.3d 155 (Tex. App. – Ft. Worth, 2014).......................12

*Skinner v. Quarterman,* No. 2:99-CV-45, 2007 WL 582808 (N.D. Tex. Feb. 22, 2007) (unpublished) ................................................................................3

*Skinner v. State*, 122 S.W.3d 808 (Tex. Crim. App. 2003) ....................................11

*Watson v. State*, 204 S.W.3d 404 (Tex. Crim. App. 2006).....................................20

## STATE STATUTES

Vt. Stat. Ann. tit. 13 ..........................................................................................13

Tex. Code Crim. Proc. art. 64.03 ........................................................ 10, 12, 15, 16

Tex. Code Crim. Proc. ch. 64...............................................................................17

Tex. Code Crim. Proc. art. 64.04 .................................................................. *passim*

## STATE LEGISLATIVE HISTORY

House Debate on SB 3, 77th Leg., R.S. (March 21, 2001)......................................16

Appellant Henry W. Skinner respectfully replies to the Brief of Appellee filed January 26, 2015 ("Appellee's Br.").

## REPLY TO APPELLEE'S STATEMENT OF THE FACTS

The State asks the Court to take judicial notice that in 2004, Mr. Skinner was allowed in federal court discovery to obtain both the plastic bag that police collected from the living room where Twila Busby was killed and a sample of Robert Donnell's fingerprints, and that Mr. Skinner's counsel "ha[ve] never disclosed the results of that [fingerprint] comparison." Appellee's Br. 5 n.7. The fingerprints from the bag did not match Donnell's. That certainly does not exonerate Donnell, as those prints could have been left by any of the many law enforcement officers and court personnel who subsequently handled the bag.

If the Court is to take judicial notice of the record of Mr. Skinner's federal habeas proceeding, as Respondent urges, it should also take notice of the following more important facts from that proceeding. First, in federal court Andrea Reed *recanted* those parts of her trial testimony that likely had tipped the balance for the jury in favor of conviction.[1] Most important, she disavowed her descriptions of the functions Mr. Skinner was able to perform on the night of the crimes (which had

---

[1] The State cites Ms. Reed's testimony as important evidence of Mr. Skinner's guilt. *See* Appellee's Br. 6-7.

1

undermined the defense theory that he was too impaired by alcohol and drugs to have committed the murders).[2] She acknowledged the following falsehoods:

- Ms. Reed testified at trial that she had told Mr. Skinner not to enter her house and that he "somehow" got in anyway. (Tr. 26:491) This claim was important because it portrayed Mr. Skinner, only minutes after the murders, as performing a feat requiring considerable dexterity and presence of mind. (EH I:228.[3]) Ms. Reed admitted in federal court that she had fabricated that account out of fear that the police would charge her as an accessory if she told the truth. After becoming aware that Mr. Skinner was "banging on the side of the trailer," Ms. Reed went outside and had to help him up the steps. (*Id.*) Even then, he stumbled, fell over backwards and had to lean on Ms. Reed's arm to get into the house. (*Id.* II:270-71.)

- At trial, Ms. Reed claimed that, after Mr. Skinner was inside, he took off his shirt and laid it over the back of a chair. The truth was that he could not remove his shirt without her assistance, and it was she, not he, who draped it over the chair. (*Id.* I:229.)

- At trial, Ms. Reed testified that Mr. Skinner heated sewing needles and tried to bend them. In fact, it was Ms. Reed who did so, as he was too impaired to perform such acts. (*Id.* at I:230.)

- At trial, Ms. Reed said that Mr. Skinner went from the dining room to the bathroom on his own. In truth, he could not walk down the hall and return to the living area without her assistance. (*Id.* I:230-31, II:272.)

- At trial, Ms. Reed testified that Mr. Skinner threatened to kill her if she called the police. In fact, while he told her not to call anybody, "he never

---

[2] Even so, at trial Ms. Reed acknowledged that Mr. Skinner was "f***** up" from both alcohol and drugs (Tr. 26:515), talked about things that she knew had never happened (Tr. 26:522), at times seemed unaware of where he was or who he was talking to, sometimes calling Ms. Reed "Twila" (Tr. 26:522, 26:526), and told a number of inconsistent and largely incoherent stories about what had happened that evening (Tr. 26:494, 26:500), including that he had been stabbed several times and "gut shot" (Tr. 26:491), neither of which was true.

[3] We cite the transcript of the federal evidentiary hearing as "EH," followed by the volume and page number. Petitioner's Exhibits from that hearing are cited as "EH PX," with number.

2

said that he would kill me" (*id.* I:231), and she never felt threatened by him. (*Id.* II:266.) Nor did she believe he was a threat to Twila. (*Id.* II:278.)

- At trial, Ms. Reed testified that of all the fanciful stories Mr. Skinner told her on the night of the murders, he swore her to secrecy respecting only one: that he believed he might have kicked Twila Busby to death. (Tr. 26:528.) That, too, was untrue. He told "a whole lot of stories" and swore her to secrecy with "[e]very story." (EH II:277, I:231.)[4]

Second, compelling evidence of Donnell's guilt – in addition to that presented at trial – was introduced in the federal proceeding. Debra Ellis, who lived next door to Donnell and his wife and had known them for about three years at the time of the murders, offered particularly significant testimony. (EH I:34.) In addition to corroborating several witnesses' testimony that Donnell had a temper and a history of serious violence, especially toward women, Ms. Ellis recounted the time, only a few days after the murders, when she observed Donnell giving his pickup truck a fanatically thorough cleaning, even though it was cold outside. (*Id.* I:23.) Donnell stripped down the interior, removed the carpet, and scrubbed the

---

[4] Ms. Reed's testimony in habeas was offered to support a claim that the prosecution had coerced her into testifying falsely at trial. The State's witnesses at the federal hearing addressed the coercion issue rather than whether her trial testimony was true. In that light, the federal magistrate's choice not to credit Ms. Reed's habeas testimony is best understood as finding that her trial testimony was not coerced, not that it was true. *See Skinner v. Quarterman,* No. 2:99-CV-45, 2007 WL 582808, at *16 (N.D. Tex. Feb. 22, 2007) (unpublished). That focus also explains why the federal court failed to address the fact that the scientific evidence about Mr. Skinner's condition corroborated Ms. Reed's recantation, and that she lacked any motive to recant other than clearing her conscience – standing fast even after being threatened with a perjury charge. *See* Petitioner's Motion in Limine at 2-4 & Exs. 1-3, *Skinner v. Quarterman*, No. 2:99-CV-0045 (N.D. Tex.), ECF No. 128 (grand jury transcript showing that prosecutor aggressively threatened Ms. Reed with indictment if she did not withdraw her recantation).

3

metal floorboards with an astringent cleaner. (*Id.*) Donnell's intense activity was particularly noteworthy because, in three years as his neighbor, Ms. Ellis had never before seen him clean his truck, which was a "clunker" to begin with. (*Id.* I:23-24.) Donnell spent "hours" at the task; he took everything out, including the seats. After removing everything and scrubbing the entire interior of the cab, Donnell hosed it out thoroughly. He replaced the seats but not the carpet. (*Id.* I:23-24.) Within the next two weeks Donnell also repainted his pickup by hand. (*Id.* I:26, I:42.)

Ms. Ellis also testified at the federal hearing that she'd often seen Donnell wearing a windbreaker jacket "just like" the one police collected as evidence after finding it next to Twila Busby's body. (*Id.* I:30-31.) Ms. Ellis has since been shown photographs of the jacket recovered from the crime scene and was prepared to testify at the art. 64.04 hearing that it is *the* one she saw Donnell wear. However, the State objected to Ms. Ellis's testimony on the ground that because the jacket was not DNA tested, it was irrelevant to any issue at the hearing. *See* Hearing Tr. 2:190-95. The convicting court sustained the objection, despite the fact that the jacket was one of the items Mr. Skinner requested to have DNA tested. (Record 7-8). The jacket was not tested because, sometime between Mr. Skinner's trial (when it was marked as an exhibit, *see* Tr. 26:715) and the testing at issue here, the State, without explanation, "lost" it. *See* DX-6. The jacket is potentially

4

the most significant item of evidence in the entire case in terms of what DNA testing might yield,[5] and yet is the only item the State somehow failed to safeguard.

## SUMMARY OF ARGUMENT IN REPLY

The legal standard applied by the convicting court was not, as the State argues, a mere "affirmative restatement" of the standard set forth in art. 64.04, but rather a complete perversion of it. Nor is the "preponderance of the evidence" standard argued for by the State permissible under art. 64.04, which by its plain terms adopts the well-understood "reasonable probability" standard of *Strickland v. Washington*, 466 U.S. 668 (1984).

The State's efforts to downplay the DNA test results favorable to Mr. Skinner are unavailing, in large measure because it views them through the lens of an improper legal standard. At the same time, the State exaggerates the significance of test results showing Mr. Skinner's DNA on the knife and in the boys' bedroom, results entirely consistent with his having had a profusely bleeding cut on his hand and the scientific evidence of his highly intoxicated condition.

---

[5] The jacket was found lying next to Twila Busby's body, *see* SX-22, and photos of it, DX-1-5, show blood spatter and human hairs, as well as sweat stains around the collar and cuffs that could identify its owner.

# ARGUMENT

**I. This Court Should Reject the State's Articulation of the Applicable Legal Standards.**

**A. The convicting court's articulation of the governing legal standard was not a "mere[ ] ... affirmative restatement" of art. 64.04, but a wholesale inversion of the statute's language, and had the effect of requiring Mr. Skinner to show clear and convincing evidence of actual innocence.**

Art. 64.04 requires the convicting court to determine whether it is "reasonably probable" that a defendant "would *not* have been convicted" had DNA test results been available when his case was tried. Tex. Code Crim. Proc. art. 64.04 (emphasis added). Here, however, the convicting court held against Mr. Skinner after finding that had the post-conviction DNA test results been available at trial, "it is reasonably probable that [Mr.] Skinner *would* nevertheless *have been* convicted." *See* Appellant's Brief at 18-19 (citing Record 186 (emphases supplied)). As Mr. Skinner's opening brief explained in detail, the legal standard of "reasonable probability" that the Legislature chose for art. 64.04 has a settled meaning.[6] It describes a degree of doubt that "undermines confidence in the result" of the proceeding under review but does not rise to the level of a preponderance of the evidence. *See*, *e.g.*, *Strickland*, 466 U.S. at 693-94 (a

---

[6] The Legislature's choice of a term that has a fixed meaning understood by courts around the Nation is significant. "[A]s Justice Frankfurter advised, 'if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.'" *Evans v. United States*, 504 U.S. 255, 260 n.3 (1992) (quoting F. Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM L. REV. 527, 537 (1947)).

6

reasonable probability is "somewhat lower" than a preponderance of the evidence.[7]

So this Court's review must begin with the recognition that a "reasonable probability" is *less* than a preponderance of the evidence. On its own terms, then, the convicting court's finding means that it ruled against Mr. Skinner because it concluded that even if jurors had heard the DNA test results, there was some likelihood – and *necessarily* a likelihood less than "more likely than not" – that they nevertheless *would* have convicted Mr. Skinner. It follows ineluctably from the plain language of the convicting court's order that Mr. Skinner, to prevail, would have been required to show that there was *no* reasonable probability of conviction if the jury had heard the DNA test results. That is a far heavier burden

---

[7] The cases echoing this proposition are legion. *E.g.*, *Williams v. Taylor*, 529 U.S. 362, 404–06 (2000) (O'Connor, J., for the Court) (state court improperly applied "preponderance of evidence" standard to defendant's claim of ineffective assistance of counsel); *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9 (2004) (citing *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995)) ("The reasonable-probability standard is not the same as, and should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but for error things would have been different"); *Nix v. Whiteside*, 475 U.S. 157, 175 (1986) (to show reasonable probability of a different verdict, defendant "need not establish that [counsel's errors] more likely than not altered the outcome"); *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (in the context of a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), proof of a reasonable probability of a different outcome "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted [in] acquittal") (citation omitted); *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (a reasonable probability of a different result "lies between prejudice that 'had some conceivable effect' and prejudice that 'more likely than not altered the outcome in the case'"); *Purdy v. Zeldes*, 166 F. Supp. 2d 935, 941 (D. Vt. 2001) ("the 'reasonable probability' standard is lower than the preponderance standard"); *Hagos v. People*, 288 P.3d 116, 120 (Colo. 2012) ("The word 'probability' [in "reasonable probability"] does not require a defendant to show that the deficient performance more likely than not altered the outcome of the case.").

than the one the statute imposes – that the defendant need show only a reasonable probability that, if presented with the DNA testing results, at least one juror would have harbored a reasonable doubt about his guilt.

The State contends that the convicting court's misstatement is innocuous and in any event harmless. *See* Appellee's Br. 27. But that argument assumes that the art. 64.04 standard and the one the convicting court articulated are merely two ways of saying the same thing. That is the only way to make sense of the State's insistence that the convicting court's version is a "mere[ ] ... affirmative restatement" of the statutory language. *See* Appellee's Br. 27. But the two standards are not the same, and the difference between them is not semantic. The standard the Legislature wrote into art. 64.04 – that the court must assess the likelihood that the defendant "would not have been convicted" – is the only one that gives meaning to the presumption of innocence and attends to the fundamental principle that the State cannot obtain a conviction unless it proves guilt beyond a reasonable doubt. The statutory standard aims to honor those basic rights by requiring the convicting court to focus on whether, in light of the new DNA test results, a juror might have been left with reasonable doubt and thus the defendant "would not have been convicted."

The convicting court went far beyond that standard. Indeed, it went far beyond the preponderance-of-evidence standard. By its terms, the convicting

8

court's standard required Mr. Skinner not just to show a reasonable probability that he would not have been convicted, but to rule out any possibility that he would have been convicted had the jury heard the post-conviction DNA testing results. That is the same thing as requiring Mr. Skinner to prove his innocence by clear and convincing evidence – contrary to the statutory text and the Legislature's obvious aim in enacting it.[8]

**B.      The Court should decline the State's invitation to superimpose a "preponderance of the evidence" requirement atop the "reasonable probability" standard.**

Mr. Skinner's opening brief inadvertently, but admittedly, contained conflicting statements concerning the applicable standard of review under art. 64.04. *See* Appellant's Br. 15 (citing *Smith v. State*, 165 S.W.3d 361, 365 (Tex. Crim. App. 2005), for the proposition that this Court must "examine[ ] the entire record to determine whether the appellant established, by a preponderance of the evidence, a reasonable probability that he would not have been convicted if the post-conviction DNA results had been available at trial"); *but see id.* at 16-18 (arguing that the "reasonable probability" standard in art. 64.04 stands alone, such that "the reviewing court [must] make a finding favorable to the defendant even if

---

[8] The State's further defense of the convicting court's order – that what matters is "whether DNA results affirmatively cast doubt upon the validity of [a defendant's conviction]," Appellee's Br. 28, 39 – comes closer to the actual language of art. 64.04 (which does not, however, contain any variation of the word "affirmative"), but is a far cry from the standard actually articulated and applied by the convicting court.

his showing of that degree of doubt falls below a preponderance of the evidence, as long as his showing undermines confidence in the verdict").

Mr. Skinner's apparent endorsement of *Smith*'s "preponderance of the evidence" language, which of course refers to the standard contained in art. 64.03, rather than the one reflected in art. 64.04, was unintended. Further review and research, *see infra*, only reinforces the position Mr. Skinner took in the remainder of his opening brief: that the Legislature in art. 64.04 articulated only one unitary standard, "reasonable probability," and that it would be inappropriate to superimpose on that standard a requirement that such a reasonable probability be shown by a preponderance of the evidence.

According to the State, this is an issue of first impression. Appellee's Br. 2 (requesting oral argument, in part because this case "involves ... issues of first impression regarding the standard of review"); *id*. 25-26 (citing intermediate Texas appellate court opinions that have employed simultaneously the preponderance and reasonable probability standards, and "urg[ing]" this Court "to expressly incorporate the preponderance-of-the-evidence standard into its review"). This Court has stated in cases arising under art. 64.03 of the statute that both standards should apply in tandem with respect to the initial question of whether DNA testing should be ordered at all (as opposed to the finding to be made after test results are available). Indeed, it did so in an earlier appeal in this case. *See Skinner v. State*,

10

122 S.W.3d 808, 813 (Tex. Crim. App. 2003) ("Article 64.03(a)(2)(A) requires a petitioner to demonstrate, by a preponderance of the evidence, that a reasonable probability exists that he or she would not have been ... convicted if exculpatory results were obtained through DNA testing"). But our research has not identified any decision in which this Court appears to have expressly considered and decided the matter with respect to art. 64.04, and for that reason we concur with the State that the question is one of first impression.

The State begins with the unremarkable observation that, in order for a defendant to show a reasonable probability that he would not have been convicted had post-conviction DNA test results been available at trial, "his evidence must necessarily be important." Appellee's Br. 25. We agree. But the State bounds from that premise to the conclusion that it would be "fully consistent" with the Legislature's choice to make "reasonable probability" the governing standard in art. 64.04 for this Court "to require an appellant to show that new DNA results make[ ] this reasonable probability more likely than not." Appellee's Br. 25. There is no warrant for this Court to join the State in that inferential leap.

First and foremost, the straightforward language of the statute forecloses the interpolation the State would have this Court undertake. In art. 64.04, the Legislature used only the phrase "reasonable probability" – a term which, as already mentioned, is well-known in the law. That the Legislature knew the

distinction between the two standards is even more evident when the language of art. 64.04 is compared to that of art. 64.03, where the Legislature was explicit in requiring a showing "by a preponderance of the evidence" that the movant would not have been convicted if exculpatory results are produced from further DNA testing (*see* art. 64.03(a)(2)) – showing conclusively that when the Legislature meant "preponderance of the evidence," it knew how to say it.[9]  Where a statute is unambiguous, reading other requirements into its text is forbidden, as such judicial rewriting would "invade the lawmaking province of the Legislature."  *Boykin v. State*, 818 S.W.2d 782, 785-86 (Tex. Crim. App. 1991).

The Supreme Court's hierarchical distinction between "reasonable probability" and "preponderance of the evidence" was well articulated recently by the Vermont Supreme Court in analyzing a very similar statutory scheme.  In *In re Towne*, 86 A.3d 429 (Vt. 2013), the court was called upon to interpret a provision of Vermont's "Innocence Protection Act," a statutory scheme for post-conviction DNA testing.  Under the Vermont statute, DNA testing is to be granted if the

---

[9] *See*, *e.g.*, *DeWitt v. Harris County*, 904 S.W.2d 650, 653 (Tex. 1995) (it is a "familiar canon of [statutory] construction" that "'when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended'") (quoting 2A N. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 46:06 (5th ed. 1992)); *Liverman v. State*, 448 S.W.3d 155, 158 (Tex. App. – Ft. Worth, 2014) ("A corollary to the presumption that every statutory word and phrase used has a legislative purpose is that when the legislature uses certain language in one part of the statute and different language in another, we presume different meanings were intended"), *petition for discretionary review granted*, February 4, 2015.

defendant shows that, had the results of the requested DNA testing had been available to the trier of fact at the time of the original prosecution, "a reasonable probability exists that [he] would not have been convicted."  *See* 13 V.S.A. § 5566(a)(1).  In discussing this standard, the Vermont court explained why it would be improper to superimpose a "preponderance of the evidence" standard atop statutory language requiring only a "reasonable probability":

> The difference in standards may be subtle, but is nonetheless of sufficient importance to warrant the U.S. Supreme Court's explicit clarification that the reasonable probability standard is a less onerous one than a preponderance of the evidence standard.  *See Strickland*, 466 U.S. at 694 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."); *see also Williams v. Taylor*, 529 U.S. 362, 405–06 (2000) (explaining that a preponderance of the evidence standard would be "opposed to our clearly established precedent ... that the prisoner need only demonstrate a reasonable probability that ... the result of the proceeding would have been different" (quotation omitted)).

> Similar to the U.S. Supreme Court, we previously rejected—albeit in a nonprecedential manner—this precise accumulation of standards in the context of the prejudice prong of an ineffective-assistance-of-counsel claim for two reasons: one, because of the difficulty in defining what this awkward construction would mean in practice, and, two, because of the further difficulty it would engender in ascertaining on review whether a trial court applied the correct standard.  *See In re Combs*, 2012 WL 2880535, at *3 (Vt. 2012) (unpub. mem.) ("[I]n ruling that petitioner here failed to 'prove by a preponderance of the evidence that there was a reasonable probability' of a different outcome, the trial court conflated the preponderance and reasonable-probability standards that the [U.S] Supreme Court has carefully distinguished, and rendered it impossible to determine which standard the court applied."

13

The same concerns exist in the case of DNA testing. Therefore, we eschew the preponderance standard in this context and adopt the *Strickland* standard ….

*Towne*, 86 A.3d at 433 (parallel citations and paragraph numbers omitted).

The Vermont Supreme Court's reasoning in *Towne* is persuasive here. As a legal matter, piling a "preponderance of the evidence" standard atop the statutory "reasonable probability" standard would judicially rewrite art. 64.04 to make it harder to satisfy. And, as a practical matter, endorsing such an "awkward construction" would introduce needless complication and invite confusion among trial courts called upon to make such determinations. This Court should firmly reject the State's proposal, and should affirmatively disavow any contrary inference that might be drawn from *dicta* in earlier decisions.

**C.     In arguing that the results of DNA testing on the blanket from Randy Busby's bed – which showed no trace of Mr. Skinner's DNA – are not exculpatory, the State invokes an erroneous recounting of the legislative history of art. 64.04.**

The State asserts that DNA test results "are not exculpatory where, as here, Appellant appears to offer the evidence (or lack thereof) to rebut *a part* of the prosecution's case." Appellee's Br. 39 (emphasis added). This is the State's entire response to Mr. Skinner's claim that the absence of his blood on the blanket covering Randy Busby's body would have been viewed by the jury as exculpatory because it would have rebutted a key element of the prosecution's theory of how the murders were committed. *See* Appellant's Br. 34-36.

14

For this remarkably crabbed view of what constitutes exculpatory evidence, the State relies on *Kutzner v. State*, 75 S.W.3d 427, 438 n.23 (Tex. Crim. App. 2002) (superseded by statute as stated in *Ex parte Gutierrez*, 337 S.W.3d 883, 890 n.16 (Tex. Crim. App. 2011)), in which this Court stated that "[d]uring debate over the DNA statute, the Senate rejected a House Floor Substitution to article 64.03(a)(2)(A) that would have read 'had exculpatory results been obtained through DNA testing before or at trial, the convicted person could have used those doubts to raise a reasonable doubt as to the person's guilt or to rebut a part of the prosecution's case.'" *Id.* (citing House Debate on SB 3, 77th Leg., R.S., (www.house.state.tx.us, House Archived Chamber Broadcasts at 1:08:00-2:37:00, March 21, 2001), at 2:14:00)). From this premise, the State argues that DNA test results that conclusively rebut only a part – even a key part – of the State's trial theory about how the crimes were committed "present[ ] no basis for th[is] Court to reject the trial court's finding under article 64.04." Appellee's Br. 39.

Regrettably, *Kutzner* erred in its accounting of what happened in the cited House debate, and the State multiplies the error by relying on that mistaken account here. *Kutzner* cites the House debate for the proposition that the House "declined to pass" a proposed amendment to art. 64.03(a)(2)(A) by Rep. Dutton that would have added language to the effect that DNA results would be exculpatory if they could have been used, *inter alia*, "to rebut a part of the

15

prosecution's case." *Kutzner*, 75 S.W.3d at 438 n.23. The State turns that into "the Senate rejected a House Floor Substitution to article 64.03(a)(2)(A)" that would have added the language about rebutting a part of the prosecution's case. Appellee's Br. 39. In fact, the record of the cited House debate actually shows that after discussion of the proposed amendment, Rep. Dutton *withdrew* it, and the committee chair stated that Rep. Dutton was doing so because, with a previous change in the relevant section, the statute was "acceptable" to him. House Debate on SB 3, 77th Leg., R.S. (www.house.state.tx.us, House Archived Chamber Broadcast at 2:22:50, March 21, 2001). Thus, there was no vote in either the committee or the full House on Rep. Dutton's proposed amendment (*i.e.*, the House did not "declin[e] to pass" it).[10] More important, Rep. Dutton withdrew the proposal because he was persuaded that it was unnecessary. That, in turn, strongly suggests that under the original language of the new post-conviction DNA testing legislation, it was understood that DNA test results could be exculpatory if they "rebut[ted] a part of the prosecution's case."[11]

---

[10] The State somehow transmuted these events into *the Senate*'s "reject[ing]" Rep. Dutton's amendment. *See* Appellee Br. 39. In any event, the House debate record shows that no legislative body actually rebuffed the proposed change, which is the inference the State urges.

[11] Moreover, both *Kutzner* and the Dutton amendment addressed art. 64.03, not art. 64.04 – which, as discussed, incorporates a different standard. That fact greatly limits their relevance here.

And that conclusion – that evidence can be exculpatory within the framework of the post-conviction DNA testing statute even if it "only" rebuts a key part of the State's case – is altogether reasonable. Strictly speaking, a DNA test result on a vaginal swab from a rape victim that does not match the DNA profile of the accused may only "rebut a part of the prosecution's case" (where, for example, the prosecution also presents an eyewitness who claims to be able to identify the accused as the assailant). Yet no one would say that in light of those competing circumstances, the DNA exclusion is not exculpatory because it only "rebut[s] a part of the prosecution's case." The State's argument is just another attempt to put the old wine of requiring "proof of actual innocence" into a new bottle (this time labeled "affirmative doubt about the validity of a conviction," *see* Appellee's Br. 39). The Legislature made clear in response to *Kutzner* that no showing of actual innocence is required under Chapter 64, and this Court should not accept the State's invitation to reintroduce such a requirement under the guise of "affirmative doubt."

The bottom line is this: the State had a theory about how these three murders could have been committed by one person acting alone, a theory that the killings were committed in a particular order, as well as a theory about why the jury should not accept the deep cut on Mr. Skinner's hand as evidence that he was a surviving

17

victim of the crime rather than its author.[12]  The State's claim that Mr. Skinner stabbed Randy Busby to death as he lay asleep in the top bunk, and that in doing so he cut himself on the blade of the murder weapon, was absolutely essential to fitting together the other facts and circumstances of the crime in a way that could lead a reasonable juror to conclude that Mr. Skinner was guilty.  Thus, the DNA test results that powerfully rebut that claim – because no DNA from Mr. Skinner appears where, according to the State's theory, it should surely be found – are certainly exculpatory.

> **D.     Keeping faith with Texas's traditional emphasis on the importance of juries requires a standard of review that focuses on how a reasonable juror could evaluate the evidence.**

Mr. Skinner's opening brief argued that in making the art. 64.04 finding, a convicting court should consider how a reasonable lay juror might have viewed the competing evidence.  *See* Appellant's Br. 21-23.  The convicting court here, in contrast, repeatedly made its own credibility findings and assigned weight to

---

[12] Namely, the State theorized that Mr. Skinner first assaulted Twila Busby, then had to kill her two adult sons to eliminate them as witnesses.  The State contended that after strangling and bludgeoning Twila, Mr. Skinner went to the boys' bedroom, where he stabbed Elwin Caler first (when Caler purportedly came out of his lower bunk and grappled with Mr. Skinner), and then stabbed Randy Busby.  *See* Tr. 30:1556-57, 1607-08.  The State's theory can be squared with the physical evidence only if Mr. Skinner cut his hand in the course of the third murder (the stabbing of Randy Busby), because, despite Mr. Skinner's copiously bleeding hand wound, no blood was seen on the end of the axe handle wielded by whoever bludgeoned Twila.  Thus, the absence of any DNA from Mr. Skinner on the blanket that covered Randy Busby's body is a fact that destabilizes the State's whole explanation for how one massively intoxicated person could have murdered all three victims and come away with a severe cut to his hand.

various items of evidence. *Id.* In short, it acted as a direct fact-finder rather than assessing what a reasonable lay juror might have found.

The State defends the convicting court's approach, albeit without much argument beyond simply asserting that this Court typically defers to a trial court's resolution of factual questions that turn on credibility or demeanor. Appellee's Br. 28-29.

Our point is a subtler one. Where a statute (like art. 64.04) requires a reviewing court to assess the probable impact upon a prior proceeding of changes in the evidence, and the prior proceeding was before a jury, the reviewing court should make its findings through the lens of how a reasonable juror might view the new constellation of facts, rather than how the court itself subjectively views them. *See* Appellant's Br. 23 n.11 (discussing how this approach is indicated by *Strickland*, 466 U.S. at 700).

In effect, the State's argument is that the convicting court's adoption of one particular view of the evidentiary picture rules out the possibility that a reasonable jury would reach different conclusions. That assumption is mistaken. Saying that a judge's findings are "supported by the record" is far from saying that *no* rational fact-finder could have reached a different conclusion. Two such fact-finders viewing the same evidentiary record could draw different conclusions, and neither finding would be "clearly erroneous" if both interpretations "ha[d] support in

inferences . . . drawn from the facts in the record." *Id.* The Supreme Court has "long recognized [that] a jury and a judge can draw different conclusions from the same evidence." *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 555 (1990) (citation omitted). This is particularly so where the fact-finding body is a criminal trial jury duty-bound to apply the presumption of innocence and resolve all reasonable doubts in favor of the defendant at trial.

The convicting court's approach is also misguided because it affronts the importance Texas, the nation's "most jury-deferential state," has historically attached to the jury's role. *See Brooks v. State*, 323 S.W.3d 893, 923 (Tex. Crim. App. 2010) (Cochran, J., concurring). The Framers of the 1876 Texas Constitution "had great faith in juries" that has been a cornerstone of Texas jurisprudence ever since. *Watson v. State*, 204 S.W.3d 404, 429 & n.47 (Tex. Crim. App. 2006) (Cochran, J., dissenting on other grounds). Texas has many "unusually jury-deferential laws and policies." *Id*. at 429 n.47 (listing examples, and citing George D. Braden, THE CONSTITUTION OF THE STATE OF TEXAS: AN ANNOTATED AND COMPARATIVE ANALYSIS 53–57 (1977)). Texans agree that the right to trial by jury "reflect[s] a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over life and liberty of the citizens to one judge or group of judges." *Carella v. California,* 491 U.S. 263, 268 (1989) (Scalia, J., concurring) (alteration in original). Given the emphasis Texas historically has

20

placed on the jury's role, this Court should make it clear to trial courts making findings under art. 64.04 that they must avoid the temptation to substitute their own subjective view of the evidence for that of a reasonable juror.

## II.    The State's Efforts to Downplay the DNA Test Results Favorable to Mr. Skinner Are Unavailing.

### A.    The finding by the State's expert that three hairs found in Twila Busby's hands were "visually dissimilar" from those of any of the victims cannot be casually brushed aside.

Mr. Skinner's opening brief showed that three hairs found clutched in Ms. Busby's hands had the mitochondrial DNA profile of the maternal line of the Busby family (including the alternative suspect Donnell), but were found by a Department of Public Safety trace analyst to be "visually dissimilar" to that of any of the three victims.  This evidence would have given the jury a compelling additional basis to suspect that Donnell was the real killer.  Appellant's Br. 24-29.

The State's principal response is that Mr. Skinner "overinflates" the alleged significance of 'visually dissimilar' hairs."  Appellee's Br. 31.  The State points out that the trace analyst who made the hair comparisons testified at the art. 64.04 hearing that, despite his official finding of visual dissimilarity, he did not definitively *exclude* the victims, or for that matter any of their other maternal relatives, as the contributors of those hairs, and thus the evidence falls short of affirmative proof that the hairs came from Donnell.  Appellee's Br. 31-34.

The State's response misses the point. To be sure, other possible explanations exist for the presence of "visually different" hairs in Ms. Busby's hands with her MtDNA profile, including that they came from Ms. Busby herself, but the State cannot walk back the fact that their highly trained and qualified analyst, when asked in the laboratory to do a comparison under magnification of the three suspect hairs to the 70 known samples taken from the victims, declared all three to be visually dissimilar. *See* Appellant's Br. 27-28 & n.13. Furthermore, while it is also possible that the hairs belonged to some other maternal relative, the State ignores Mr. Skinner's showing that there was ample room for the jury to reject that explanation as well, given the evidence that Ms. Busby's mother almost never visited the home while Mr. Skinner lived there, and the absence of evidence that any other maternal relative regularly visited. *Id.* at 28-29.[13] As discussed above, Mr. Skinner does not have to show that the MtDNA results of the three dissimilar hairs rose to the level of clear and convincing proof of his innocence, as the State urges this Court to require, but only that it would have formed a basis, when coupled with the other evidence, for a reasonable juror to question whether Donnell was the real murderer. That it certainly does.

---

[13] The State inconsistently argues that the MtDNA results were in fact inculpatory because a fourth hair found in Ms. Busby's hand had Mr. Skinner's MtDNA profile. Appellee's Br. 32. However, the record was clear that Mr. Skinner lived in the house for at least the six weeks preceding the murders, making the presence of his hair much more likely to be innocuous than can be said for the Busby maternal relatives other than Donnell.

**B.** **The State fails in its effort to demonstrate that the absence of any finding of Mr. Skinner's DNA mixed with that of any of the victims anywhere but on the knife is not exonerating.**

In his opening brief, Mr. Skinner showed that the failure of the post-conviction round of DNA testing to find his DNA mixed with that of any of the victims anywhere other than on the knife used to kill Elwin Caler and Randy Busby was exonerating because, if he were the real killer, he would have likely had the blood of the two boys mixed with his own on his bleeding right hand. Appellee's Br. 30-33.

The State argues that the absence of Elwin's or Randy's blood from the door knobs leading out the back of the house has no evidentiary significance because, even if someone else had killed them, by Mr. Skinner's theory that alternative killer would also have had to exit the house through the rear door and would have left their blood on the door knobs. Appellee's Br. 36. What the State fails to take into account, however, is that the alternative perpetrator could well have had the presence of mind, which Mr. Skinner in his highly intoxicated state lacked, to wash or wipe the victims' blood from his hands before leaving.[14]

The State also argues that Mr. Skinner's argument ignores the fact that pretrial DNA testing showed the blood of two victims, Twila Busby and Elwin

---

[14] The evidence at trial showed that Mr. Skinner was at best in a stuporous condition at the time of the murders, *see*, *e.g.*, Tr. 29:1371, while Donnell, though drunk, was obviously much more functional than that. *E.g.*, Tr. 29:1281.

23

Caler, on his clothes. Appellee Br. 37. But this argument is a non-sequitur. The presence of their blood on his clothes is fully consistent with his theory at trial that he was unconscious on the couch when Twila was being beaten and that had contact with Elwin's bloody body at some point in the melee. The point the State does not rebut is that in all of the many places where Mr. Skinner's blood was found to have dripped from his bleeding hand, it was not once found to have been mixed with any of the victims, an improbability if he were the real killer. *See* Appellant's Br. 30-31 (the fatal knife wounds to both Elwin and Randy penetrated to the full length of the blade and beyond).

### C. The State fails to rebut Mr. Skinner's showing that the results of the testing on the dishtowel would have given him another basis for a finding of reasonable doubt.

Mr. Skinner's opening brief also pointed to the absence of Mr. Skinner's DNA on a dishtowel on which the blood of Twila Busby was found as a further basis on which defense counsel could have argued reasonable doubt. Appellee's Br. 36-40. The State's principal response is that these DNA test results cannot be considered exculpatory under art. 64.04 because they would only have "muddied the waters." *Id*. (quoting *Ex Parte Gutierrez,* 337 S.W.3d 887, 892 (Tex. Crim. App. 2011)).

*Gutierrez* is inapplicable here because it dealt with denial of an original motion for DNA testing and thus was governed by arts. 64.01 and 64.03, which, as

24

discussed above, have different threshold standards. Under art. 64.04, the issue is whether the evidence could form a basis for creating reasonable doubt in the mind of at least one juror. While perhaps inartful, the term "muddy the waters" is not an inapt description of the role of a defense attorney in creating reasonable doubt. Indeed, in any case in which conflicts in the evidence exist, the exonerating evidence could be said to "muddy the waters." Under a system in which the presumption of innocence applies, the appropriate jury response in any case in which the waters are "muddied" is to acquit.

The State also argues that it was Mr. Skinner's burden to show that it was "more probable than not" that the extraneous alleles found on the dishtowel were deposited there at the time of the murders. Appellee's Br. 41-42. Again, the State misunderstands the applicable standard, as discussed *supra*.

**III.  The State Exaggerates the Impact of the Test Results Showing Mr. Skinner's DNA Profile on the Knife and at Various Locations in the House.**

The State contends throughout its brief that the DNA testing results are more inculpatory than exonerating because they "identified [Mr. Skinner's] DNA profile in 20 locations" at the crime scene, including on "at least 8 locations in the boys' bedroom including on a cassette tape (2 profiles), a tennis shoe (2 profiles), on a cassette tape, on a dresser, on a wall near a dresser, and on a comforter." Appellee's Br. 39. There is nothing remarkable, and certainly nothing

25

incriminating, about the finding that a person with a profusely bleeding hand left blood droplets wherever he went. Indeed, given that the prosecutor argued to the jury that if Mr. Skinner was, as claimed, in a stuporous, staggering state, then his fingerprints would have been found in *more* locations throughout the house, Tr. 30:1554, the DNA evidence could be said to have filled that gap and supported the defense theory.

The State particularly emphasizes that many of these locations were in the sons' bedroom, where Randy was murdered. The implication, apparently, is that Mr. Skinner had no reason to be in that room other than to kill the two boys. But equally plausible explanations are that Mr. Skinner went to check on Elwin and Randy's condition after regaining consciousness and finding Twila dead, or that he merely staggered in there in his stuporous state. In any event, the DNA testing added nothing significant in this regard because the jury already knew that Mr. Skinner had gone into the sons' bedroom after his hand was cut because his bloody handprint was found on a door jamb in that room. Tr. 27:913. Even this evidence was more exonerating than inculpatory, as its location near the floor corroborated the defense theory that he was falling-down drunk as he made his way through the house. *See* Tr. 28:1384 (palm print was consistent with Mr. Skinner's impaired balance and staggering gait).

26

Finally, the State points out that Mr. Skinner's DNA, along with that of the stabbing victims, was found on samples taken from the knife. This is to be expected if he was cut by the knife on the night of the murders. *See* Hearing Tr. 86-90 (Dr. Heinig) (blood of victim often transfers from blade to handle when knife is dropped or during swabbing process in laboratory). It is also to be expected if, as a resident of the house, he used it prior to the murders for normal household chores. *Id.* Thus, the presence of Mr. Skinner's DNA on the knife or at several locations in the boys' bedroom does not support the State's contention that a jury would necessarily view these results as inculpatory.

## CONCLUSION

Mr. Skinner respectfully renews his request for the relief prayed for in his opening brief.

Respectfully submitted,

/s Robert C. Owen

_____
ROBERT C. OWEN
Texas Bar No. 15371950
Bluhm Legal Clinic
Northwestern University Law School
375 East Chicago Avenue
Chicago, IL 60611-3069
(312) 503-0135 voice
(312) 503-8977 facsimile

27

DOUGLAS G. ROBINSON
1440 New York Avenue, N.W.
Washington, DC 20005-2111
(202) 371-7800 voice
(202) 393-5760 facsimile

*Counsel for Appellant*

Dated: February 17, 2015

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with the typeface requirements of Tex. R. App. Proc. 9.4(e) because it has been prepared using Microsoft Word 2010 in Times New Roman font using 14-point font for text and 12-point font for footnotes. This document also complies with the word-count limitations of Tex. R. App. Proc. 9.4(i)(2)(C), limiting "[a] reply brief in an appellate court" to 7,500 words, because it contains 7,455 words, excluding any parts exempted by Tex. R. App. Proc. 9.4(i)(1).

/s Robert C. Owen

_____
ROBERT C. OWEN
Counsel for Appellant

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2015, I caused a true and correct copy of the foregoing Reply Brief to be sent electronically to the following counsel, with hard copies to follow via Federal Express:

**Franklin McDonough**
District Attorney for the
31st Judicial District of Texas
P. O. Box 1592
Pampa, Texas 79066
Franklin.McDonough@graycch.com

**Edward L. Marshall**
Chief, Criminal Appeals Division
**Katherine D. Hayes**
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, TX 78711-2548
edward.marshall@texasattorneygeneral.gov
katherine.hayes@texasattorneygeneral.gov

/s Robert C. Owen

_____
ROBERT C. OWEN
Counsel for Appellant

30